**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PRINCETON OPHTHALMIC, LLC, | : HON. PETER G. SHERIDAN, U.S.D.J. |
| Plaintiff, | : Case No.: 3:14-cv-05485-PGS-DEA |
| v. | : |
| CORINTHIAN OPHTHALMIC, INC.,<br>SKIP BALLOU, DR. SEAN IANCHULEV,<br>DR. MARK PACKER, EYENOVIA, INC.,<br>AND JOHN DOES 1-100, | :<br>: **AMENDED<br>COMPLAINT AND JURY<br>DEMAND** |
| Defendants. | : |

Plaintiff Princeton Ophthalmic, LLC, a limited liability corporation of the State of New Jersey, located at 9 Grace Hill Court, Titusville, New Jersey, by way of Complaint against the above-named defendants, says that:

## I. NATURE OF THE ACTION

1.      This is a securities fraud action, arising out of misrepresentations made by the defendants to Plaintiff Princeton Ophthalmic, LLC, in connection with the sale to it of 19,900 shares of the common stock of Defendant Corinthian Ophthalmic, Inc., in June of 2012, for a purchase price of $1,990,000.  It is also an action for recovery of compensatory and punitive damages based on common law fraud, negligent misrepresentations, and the breaches of fiduciary duties described herein, as well as for equitable and/or injunctive relief under the New Jersey Uniform Fraudulent Transfer Act ("UFTA"), for fraudulent transfer.

2.      Plaintiff brings this action in this Court pursuant to the Securities Exchange Act of 1934, for recovery of compensatory damages, either by way of rescission, or based upon the difference between the $1,990,000 paid by it for the stock of Defendant Corinthian, and the actual value of the said stock, at the time of its purchase; and for recovery of punitive damages, for the acts of common law fraud, breaches of fiduciary duties, and fraudulent transfer of assets described herein.

3.      As explained below, at the time Plaintiff agreed to purchase its shares of the stock of Defendant Corinthian Ophthalmic, Inc. ("Corinthian"), Defendant Corinthian and the other named Defendants represented to Plaintiff that Corinthian was the owner of a proprietary ocular drug delivery device ( its so-called "WHISPER™" device), which represented a significant technological advancement in the delivery of ocular drugs, had "demonstrated" its ability to deliver ocular drugs to the eye with a level of consistency, efficiency, and patient comfort far superior to that of a conventional eye dropper, and had been successfully tested on numerous occasions, involving numerous ophthalmological patients.  In fact, however, at all times hereinafter mentioned, the Defendants either knew, or recklessly failed to determine that:  (1) the WHISPER device had *never* demonstrated its ability to deliver ocular drugs with *any* level of consistency whatsoever, no less a consistency "superior to that of a conventional eye dropper;" (2) the "test results" and "technological achievement" referenced in the written Offering Materials provided to Plaintiff, and in oral representations made to Plaintiff by Defendant Skip Ballou, in his capacity as President and CEO of Corinthian, and by Defendant Sean Iancheluv, in his capacity as a member of Corinthian's Board of Directors and its Medical Advisory Board, had in fact been either substantially or completely fabricated; (3) in fact Corinthian had *not* succeeded in

2

accomplishing *any* "technological achievement"; and (4) there were numerous additional misrepresentations of material fact in the written and oral representations made to Plaintiff, at the time its investment in Corinthian stock was made.

4.       In addition, shortly after the acts of securities fraud and common law fraud described herein occurred, Defendants orchestrated the sale of virtually all of the assets of Defendant Corinthian (the "Asset Sale") to a third-party entity, Eyenovia, Inc. ("Eyenovia"). In the process of consummating the said Asset Sale, Defendants engaged in numerous acts of self-dealing, which had the potential effect of providing themselves with treatment more favorable than that provided to Plaintiff and other Corinthian shareholders, whose interests were substantially diluted and/or rendered worthless as the result of this same Asset Sale transaction.  In addition, as explained below, the Asset Sale also constituted a fraudulent transfer of the assets and stock of Corinthian to Eyenovia, Inc., and a conspiracy to violate the UFTA.

## II. JURISDICTION AND VENUE

5.       This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t), and Rule 10b5 promulgated thereunder (17 C.F.R. §240.10b5); as well as under applicable principles of the statutory and common laws of  the State of  New Jersey.

6.       Jurisdiction over this matter resides in this Court pursuant to 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §1337 (interstate commerce); Section 27 of the Exchange Act (15 U.S.C. §78aa); and principles of pendent federal jurisdiction of state law claims.

7.     In connection with the acts and conduct alleged, defendants directly and/or indirectly used means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications, the United States mail, and facilities of national securities markets.

8.     Venue is this matter is proper in this district court pursuant to 15 U.S.C. §77v(a) and 15 U.S.C. §78aa in that several defendants are found, are inhabitants of, and/or transact business in this district; and the offers and sales of securities involved in this action took place in the district; pursuant to 28 U.S.C. §1391(b), in that a substantial part of the actions or omissions giving rise to these claims arose in this district.

### III. PARTIES

9.     Plaintiff Princeton Ophthalmic, LLC ("Princeton"), is a limited liability corporation of the State of New Jersey, formed by its members, the majority of whom are New Jersey physicians and medical practitioners, for the sole purpose of purchasing shares of stock in Corinthian Ophthalmic, Inc.  Significantly, at least two of the members of Princeton are ophthalmologists whose agreement to cause Princeton to purchase shares of the stock of Defendant Corinthian Ophthalmic, Inc. was motivated, in part, by their desire to assist in advancing medical science in the field of ophthalmology.

10.     Defendant Corinthian Ophthalmic, Inc. ("Corinthian"), is a corporation of the State of North Carolina with its principal place of business in Boone, North Carolina. Defendant Eyenovia, Inc. ("Eyenovia"), is a corporation of the State of Florida with its principal place of business in Tampa, Florida.

11.     Defendants Skip Ballou ("Ballou"), Dr. Sean Ianchulev ("Iancheluv"), and Dr. Mark Packer ("Packer"), were officers and/or Directors of Defendant Corinthian, at the time

of the purchases of stock that form the subject matter of this Complaint.  Defendants

Ianchulev and Packer were also members of Corinthian's "Medical Advisory Board," at the

time those purchases were made.  Upon information and belief, Defendants Ballou,

Ianchulev, and Packer are residents of the States of North Carolina, Connecticut, and Oregon,

respectively.

12.     Defendants John Does, 1-100, are individuals and/or corporations whose exact

identities are unknown to Plaintiff, but who were participants in the communication of some

or all of the misrepresentations and omissions of material fact set forth in detail below, and/or

some of the acts constituting the fraudulent transfer of assets from Corinthian to Eyenovia.

## IV. FACTUAL BACKGROUND OF MISREPRESENTATIONS MADE TO PLAINTIFF, IN CONNECTION WITH PLAINTIFF'S PURCHASE OF CORINTHIAN STOCK.

13.     At and prior to the time of Plaintiff's purchase of Corinthian stock, in June of

2012, Defendants made numerous misrepresentations to Plaintiff, with respect to the material

facts surrounding Corinthian's proprietary "WHISPER™" device, and its offering of

Corinthian stock, in both written and oral form.  The written misrepresentations, detailed

below, were contained in two documents issued by defendant Corinthian on March 29, 2012,

and provided to Plaintiff shortly thereafter, including (1) a document titled "Corinthian

Ophthalmic, Inc. Offering Documents," (Exhibit A, filed herewith), and (2) a document titled

"Corinthian Ophthalmic, Inc. Business Plan."  (Exhibit B, filed herewith).  The oral

misrepresentations, also detailed below, were made by defendant Skip Ballou ("Ballou"), the

President of Corinthian at the time of Plaintiff's purchase of Corinthian stock, who was

specifically authorized by Corinthian to make oral representations on behalf of Corinthian

(Exhibit A, at 3), and by Defendant Dr. Sean Ianchulev, a member of Corinthian's Board of Directors and of its Medical Advisory Board.  (Exhibit B, at 28).

14.     In pertinent part, the document titled "Corinthian Ophthalmic, Inc. Offering Documents" states that "THESE OFFERING MATERIALS…ALSO INCORPORATE BY REFERENCE THE COMPANY BUSINESS PLAN DATED MARCH 29, 2012 AND EXHIBITS THERETO…"  Exhibit A, at 2.  This language made it clear to Plaintiff and other reasonable prospective investors that, while physically separate, the document titled "Corinthian Ophthalmic, Inc. Offering Documents" (Exhibit A, filed herewith), and the document titled "Corinthian Ophthalmic, Inc. Business Plan" (Exhibit B, filed herewith), effectively constituted a *single* set of offering documents (sometimes referred to collectively herein as the "Offering Materials").

15.     The two documents which constitute the Offering Materials both include certain statements that are referred to as "forward looking statements."  However, the document titled "Corinthian Ophthalmic, Inc. Business Plan" makes clear that the Offering Materials were deliberately designed so that a reasonable investor could easily distinguish between which of the statements were "forward looking statements," and which of the statements purported to be representations of *existing* facts, because it specifically notes on *the very first page* of that document precisely *how* "forward looking statements" could be identified, explaining that:

> This document contains forward looking statements relating to operations that are based on management's current expectations, estimates and projections about Corinthian Ophthalmic, Inc. and the medical device industry.  <u>Words such as "expects," "intends," "plans," "projects," "believes," "estimates," "anticipates" and variations of these words and other similar expressions are used to identify such forward looking statements.</u>

Exhibit B, at 2 (emphasis supplied).

16.     The document titled "Corinthian Ophthalmic, Inc. Offering Documents" (Exhibit A), contains only an "overview" of the Corinthian WHISPER Device.  Id. at 6-7. With the exception of that "overview," however, and an additional statement asserting that "CORINTHIAN…WILL RELY UPON BOTH <u>PROVEN</u> AND <u>UNPROVEN</u> TECHNOLOGY IN ITS BUSINESS ACTIVITIES..." (Exhibit A at 8) (emphasis supplied), the remainder of the document titled "Corinthian Ophthalmic, Inc. Offering Documents" makes no specific reference whatsoever to the Corinthian WHISPER device.  Instead, it includes only a generalized discussion of business risks, certain financial information relating to share valuation, and includes the pertinent "subscription documents" a proposed investor would have to execute, in order to complete a purchase of Corinthian shares.  Id. at 8 – 42.

17.     By contrast, the document titled "Corinthian Ophthalmic, Inc. Business Plan" (Exhibit B, filed herewith), consists almost exclusively of highly *specific* factual representations regarding Corinthian's WHISPER™ device.  (Id. at  4-93).  Those specific factual assertions relate to the "technology" purportedly utilized by that device, the identity and background of the individuals in charge of the management of Corinthian, and to the purported "testing" of the WHISPER device.  In addition, in keeping with the representation that the WHISPER device would rely upon both "PROVEN" and "UNPROVEN" technology (Exhibit A at 8) (emphasis in original), the "Corinthian Ophthalmic, Inc. Business Plan" included numerous factual assertions relating to *existing* technology purportedly being utilized by the WHISPER device, *as well as* forward looking statements, relating to the technology that was *expected* to be utilized, in connection with the said device.  (Exhibit B, at 4-93).

18.     Thus, in light of (1) the statement in the document titled "Offering Documents" indicating that it "incorporates by reference" the "Business Plan" (Exhibit A at 2); (2) the statement in that document referring to Corinthian's reliance upon both "PROVEN" and "UNPROVEN" technology, in connection with its development and/or marketing of the WHISPER device (Id. at 8); and (3) the definition of "forward looking statements" set forth in the "Business Plan" (Exhibit B at 2), a reasonable investor would necessarily conclude (a) that the statements made in these two documents should be taken together; (b) that there would be statements about both "unproven" and "*proven*" technology in either or *both* of the two documents collectively constituting the Offering Materials; and that (c) where a factual assertion regarding technology employed and/or utilized in connection with the WHISPER device was *not* accompanied by words such as "expects," "intends," "plans," "projects," "believes," "estimates," "anticipates" or  "variations of these words and other similar expressions," it was *not* a "forward looking statement" regarding "unproven" technology expected to be later developed, but instead constituted a factual assertion describing *existing*, "*proven*" technology that had already *been* developed.

19.     In fact, however, as explained more fully below, Defendants have now admitted, both orally and in writing, that despite the misrepresentations to the contrary provided to Plaintiff, at the time of its purchase of Corinthian stock, virtually *all* of the technology Corinthian was relying upon, in connection with the development of the WHISPER device actually was "*unproven*," and the written representations made in the Offering Materials, and in oral statements made to Plaintiff at the time of its purchase of Corinthian stock, characterizing any of the technology described in the Offering Materials as either *existing* and/or "proven," were categorically false.  In addition, as also explained more

fully below, the written representations made in the Offering Materials, and in oral statements made to Plaintiff by defendants Ballou and Iancheluv, at the time of Plaintiff's purchase of Corinthian stock, were either largely or completely false as well.

20.     Each of the specific written and/or oral statements made to Plaintiff that was false is set forth below, along with the identity of the specific Defendant who was the source of the said statement, as well as (a) the reason why each of those statements was false; (b) the reason why each of the false statements constituted material information that a reasonable investor would have considered important, in connection with a decision of whether to purchase the Corinthian common stock that was being offered; and (c) the specific facts which give rise to a strong inference that the defendant or defendants making the statements did so with conscious knowledge that the statement was false, and/or with reckless indifference to their falsity.

### V. SPECIFIC WRITTEN MISREPRESENTATIONS BY DEFENDANT CORINTHIAN OPHTHALMIC, INC., IN CONNECTION WITH THE SALE OF CORINTHIAN STOCK TO PLAINTIFF.

21.     Corinthian made the following, specific written misrepresentations to Plaintiff, in connection with Plaintiff's purchase of Corinthian stock for a price of $1,990,000, in (1) the document titled "Corinthian Ophthalmic, Inc. Offering Documents" (Exhibit A, filed herewith), and (2) the document titled "Corinthian Ophthalmic, Inc. Business Plan" (Exhibit B, filed herewith).

22.     To begin with, in the written materials provided to Plaintiff, Defendants repeatedly emphasized, as an *existing* fact, that the WHISPER device was effectively a completed, working product that had "demonstrated" the viability and superiority of the technology it employed over the conventional eyedropper.  For example, in the "Offering

Circular" provided to Plaintiff, at or prior to the time of its purchase of the shares of stock in

Corinthian referred to herein (Exhibit A), Defendants asserted that:

> "…Corinthian's novel WHISPER[TM] device <u>utilizes</u> a proprietary fluid ejector mechanism and optical alignment to easily and conveniently deliver micron-sized droplets <u>in consistent and repeatable levels of dosing</u> with little or no sensation to the patient, with little or no stinging or tearing.

Corinthian Offering Circular of March 29, 2012, at 6 (Exhibit A) (emphasis supplied)

23.     Similarly, in the Corinthian Business Plan (Exhibit B, filed herewith),

Defendant Corinthian represented that:

> In Corinthian's CODET dilation study, the Company demonstrated that <u>its WHISPER[TM] Device delivered equivalent dilation to that of an eye drop delivered by an eyedropper using only 1/4[th] of the dosage volume of an eye drop</u>.

> …the WHISPER[TM] device <u>can</u> dose <u>in microliter volumes</u>, <u>seals</u> the drug being delivered <u>within an internal and non-permeable collapsible reservoir</u>, and <u>has</u> a structurally recessed ejector aperture that <u>prevents direct contact of the drug with the user's fingers or eye…</u>

Corinthian Business Plan of March 29, 2012, at 5-6 (Exhibit B) (emphasis supplied)

> <u>Corinthian has to date dosed 41 Rx ocular drugs and 40 OTC ocular medications from the WHISPER device in non-clinical settings.</u>  Corinthian has also <u>demonstrated</u> that the WHISPER device <u>can</u> dose high viscosity ocular treatments including *Restatisis* "right out of the box" <u>without reformulation or adjustment to the viscosity medium…</u>

Corinthian Business Plan, at 51.

> The WHISPER[TM] device, with its ability to dose such small amounts of drug to the cornea, without irritation, opens a new realm of therapy…<u>The ability of the WHISPER[TM] device to not only deliver 0.5ul-10ul precisely, but to do so conveniently, with a reusable/repeatable delivery device has been remarkable.</u>  The lack of irritation to the cornea has reduced blink and tearing responses.

Corinthian Business Plan, Appendix at 73

24.     Significantly, the written misrepresentations set forth above, in the document

titled "Corinthian Ophthalmic, Inc. Offering Documents" (Exhibit A, filed herewith), and the

"Corinthian Ophthalmic, Inc. Business Plan" (Exhibit B, filed herewith), were *not* accompanied by words such as "expects," "intends," "plans," "projects," "believes," "estimates," "anticipates" or "variations of these words and other similar expressions," and therefore were *not* "forward looking" statements, as defined in the Corinthian Offering Materials.  (Exhibit B at 2).  Instead, by virtue of the notable *absence* of that "forward looking" language, these representations constituted factual assertions that purported to represent *existing* facts and, to the extent such statements were made with regard to technology, were necessarily describing the technology at issue as constituting *existing*, "proven" technology, both in accordance with the plain meaning of the language used, and in accordance with the guidelines established in Corinthian's own Business Plan (Id.).

### a.  Why These Written Misrepresentations Were False.

25.     Nevertheless, it is now clear that each of the written misrepresentations set forth above was also false.  First, it is clear that the representation in the Corinthian Offering Circular, representing that "Corinthian's novel WHISPER device utilizes a proprietary fluid ejector mechanism and optical alignment to easily and conveniently deliver micron-sized droplets in consistent and repeatable levels of dosing" (emphasis supplied) was false, because in a letter of March 25th, 2013, circulated by Eshelman to all Corinthian shareholders (Exhibit C, filed herewith), Eshelman admitted he "was notified that there were major leakage problems with the device," and in the recorded telephone conversation of May 13, 2014 between Defendants Eshelman and Mario, and several members of Plaintiff Princeton, Eshelman and Mario admitted that the WHISPER device had "never" been developed to the point where it was a firm, controlled device that could actually perform in *any* consistent

manner, and that "none of the drugs (except basically saline/water) passed the tests…"  (See Exhibit C, filed herewith, at 2).

26.    Esheleman's letter of March 25, 2013 also now makes it clear that Corinthian *never* "demonstrated that its WHISPER$^{TM}$ Device delivered equivalent dilation to that of an eye drop delivered by an eyedropper using only 1/4th of the dosage volume of an eye drop," or that "the WHISPER$^{TM}$ device <u>can dose in microliter volumes, seals the drug being delivered within an internal and non-permeable collapsible reservoir</u>" (emphasis supplied), because those factual representations are directly *contradicted* by Eshelman's admission in that letter that the WHISPER device had "major leakage problems," and that "none of the drugs (except basically saline/water) passed the tests"; and are also directly *contradicted* by the statements of Eshelman and Mario in a recorded telephone conversation of May 13, 2014 between them and several of Princeton's members, admitting that the WHISPER device had "never" demonstrated its ability to consistently perform in any manner it was represented to be capable of performing, in the Corinthian Offering Materials.

27.    It is also now clear that the WHISPER device did *not* dose "41 Rx ocular drugs and 40 OTC ocular medications…in non-clinical settings," and did *not* "demonstrate[] that [it] can dose high viscosity ocular treatments including *Restatisis* " 'right out of the box' without reformulation or adjustment to the viscosity medium," because in Eshelman's letter to shareholders dated March 25th, 2013 (Exhibit C), and in the recorded telephone conversation of May 13, 2014 referred to above, between Defendants Eshelman and Mario, and several of Princeton's members, Eshelman and Mario admitted, both implicitly and explicitly, that there had never been "a complete, working device which passes all functional tests and can be manufactured at scale within cost constraints"  (<u>Id</u>. at 3), and that, to the

extent the Offering Materials claimed that the WHISPER device had been "successfully tested," those claims were based upon false statements made by defendant Ballou that had effectively defrauded not only Plaintiff and other prospective investors, but Eshelman and Mario as well.

      **b.   Why These Misrepresentations Were "Material."**

      28.    The written misrepresentations of Corinthian, included in (1) the document titled "Corinthian Ophthalmic, Inc. Offering Documents" (Exhibit A, filed herewith), and (2) the document titled "Corinthian Ophthalmic, Inc. Business Plan" (Exhibit B, filed herewith) were "material" because, as noted above, Corinthian's interest in its "WHISPER™" device represented the Company's only real asset, and these Offering Materials and the representations they contained were the primary documents relied upon by Plaintiff and other prospective investors, in connection with their decisions to invest in Corinthian stock.  If Plaintiff, or any other reasonable investor had known that, contrary to the representations made in the Offering Materials, Defendant Corinthian's "WHISPER™" device was *not* based upon *any* "proven" technology, but *solely* upon technology that was completely "*unproven*";  that *no* valid testing had been completed, with respect to *any* of the claimed properties of that device; and that Corinthian's claim to have achieved a "notable technological advancement" was *false*, they either would never have purchased Corinthian shares at all, or if they had done so, it would not have been at a price of $100 per share, but instead would have been for a fraction of that price at most.

**c. Facts Giving Rise To A Strong Inference Of Conscious Intent And/or Recklessness, In Connection With The Additional Written Misrepresentations Of Corinthian, In The Offering Materials.**

29.     As noted above, the WHISPER™ device was Defendant Corinthian's only real asset.  As such, Corinthian had a strong motive to maximize the potential value of its WHISPER™ device, because any artificial increase in the perception of value related to that device would translate into an increase in the value of Corinthian's stock.  Moreover, in light of the backgrounds of its Board members, and the members of its "Medical Advisory Board," including their extensive experience in the development of pharmaceutical products and/or medical devices, it is clear that Corinthian either knew, or was extremely reckless in failing to recognize the importance of the *accuracy* of the statements included in the Corinthian Business Plan, relating to the status of the technology allegedly being employed by the WHISPER™ device.  Nevertheless, based upon the admissions of defendant Corinthian, through the written and oral statements of its Board Chairman, Dr. Fred Eshelman, and those of another Corinthian Board Member, Dr. Ernest Mario, it is clear that Corinthian permitted the publication in the Corinthian Business Plan of written statements regarding the status of the technology being utilized by the WHISPER™ device, that the Company as a whole, and/or numerous of its officers and executives, consciously knew to be false, or were extremely reckless in failing to determine to be false, and taking action to correct them.

30.     There also had been no previous sale of Corinthian stock at the level of $100 per share, prior to the sale of Corinthian shares to Plaintiff.  As a result, Defendant Corinthian, as well as its officers and directors, had a strong motive to permit written misrepresentations to be made to Plaintiff and other prospective investors in Corinthian stock, through the inclusion of those misrepresentations in the Corinthian Business Plan,

either consciously or recklessly, because they knew that a sale of Corinthian stock at the level of $100 per share would result in a dramatic *increase* in the price at which Corinthian stock could be sold in the future, and a dramatic increase in the overall valuation of Corinthian itself.

## VI.  SPECIFIC WRITTEN MISREPRESENTATIONS OF CORINTHIAN ATTRIBUTABLE TO DEFENDANT DR. MARK PACKER

31.     Like the other written misrepresentations detailed above, Corinthian's Business Plan also included the following assertions of *existing* fact, regarding the technology of the Corinthian WHISPER™ device, and the testing of that device, that were directly attributable to Defendant Mark Packer, M.D. ("Packer"), a Corinthian Board member who was also the Chairman of Corinthian's Medical Advisory Board:

> In Corinthian's CODET dilation study, the Company demonstrated that its WHISPER device delivered equivalent dilation to that of an eye drop delivered by an eyedropper using only $1/4^{th}$ of the dosage volume of an eye drop.  In the CODET study, 102 healthy volunteers had their pupils dilated with each of the two most commonly used topical ocular agents.  One eye was dosed with a total of 6 ul of each agent using the WHISPER device, while the fellow eye was dosed with a drop (~ 26 ul) of each agent using a standard eyedropper.  <u>The results indicate that the WHISPER[tm] device achieved an equivalent speed and extent of dilation to the eyedropper.</u>  <u>In the view of Dr. Mark Packer, Chair of Corinthian's Medical Advisory Board, this result is a notable technological achievement and a significant advance in clinical ocular therapeutics.</u>

Exhibit B, at 5 (emphasis supplied).

32.     Significantly, these factual representations attributable to Defendant Packer also were *not* accompanied by words such as "expects," "intends," "plans," "projects," "believes," "estimates," "anticipates" or  "variations of these words and other similar expressions," and therefore were *not* "forward looking statements," as defined in the Corinthian Offering Materials.  (Exhibit B at 2).  Instead, by virtue of the notable *absence* of that "forward looking" language, they constituted factual assertions that were purporting to

represent an *existing* fact and, to the extent such statements were made with regard to technology employed by the WHISPER™ device, were describing the technology at issue as constituting *existing*, "proven" technology, that had already been completed (e.g., "<u>is</u> a notable technological achievement and a significant advance in clinical ocular therapeutics.") (emphasis supplied).

### a.  Why These Written Representations Were False.

33.    Nevertheless, in the letter of March 25, 2013 described above, circulated by Eshelman, the Chairman of Corinthian's Board of Directors (Exhibit C), and in the recorded telephone conversation of May 13, 2014 between Eshelman, Mario, and several Princeton members, also described above, Eshelman, Mario, and through them Defendant Corinthian has now admitted that, contrary to the written misrepresentations attributable to Defendant Mark Packer, M.D., set forth above, at the time of Plaintiff's purchase of Corinthian stock in June of 2012 (1) the WHISPER™ device had *never* demonstrated its ability to "deliver equivalent dilation to that of an eye drop delivered by an eyedropper using only 1/4th of the dosage volume of an eye drop," and (2) *most or all of the technological "advancements" and/or "achievements"* described in the Offering Materials, with respect to Corinthian's WHISPER™ device, had in fact *never been made*.

### b.  Why These Written Misrepresentations Were "Material."

34.    These written misrepresentations of Corinthian attributable to Defendant Packer were "material" because, as noted above, Corinthian's interest in its WHISPER™ device represented the Company's *only* real asset.  If Plaintiff, or any other reasonable investor, had known that Defendant Corinthian's WHISPER™ device was *not* based upon *any* "proven" technology, but *solely* upon technology that was completely *unproven*; that *no*

16

*valid testing had been completed*, with respect to any of the claimed properties of that device; and that Corinthian's claim to have achieved a "notable technological advancement and a significant advance in clinical ocular therapeutics" was *false*, they either would never have purchased Corinthian shares at all, or if they had done so, it would not have been at a price of $100 per share, but instead would have been for a fraction of that price, at most.

### c. Facts Giving Rise To A Strong Inference Of Conscious Intent And/or Recklessness, In Connection With The Written Misrepresentations Of Corinthian Attributable to Defendant Mark Packer, M.D.

35.     As noted above, Defendant Packer was the Chairman of Corinthian's "Medical Advisory Board," and in that capacity the individual who would be expected to have the most intimate knowledge of the *actual* status of whatever technology Corinthian was employing, or not employing, in connection with the WHISPER™ device, and the individual who would be expected to be in the best position to verify the accuracy of any and all claims made by the engineers and/or other Corinthian employees, regarding whatever technological "achievement" any of them may have been claiming had been made, in connection with that device.

36.     Moreover, Defendant Packer either knew or should have known, by virtue of his medical background and his status as the Chairman of Corinthian's "Medical Advisory Board," that any direct quotation attributable to him in the Corinthian Business Plan, setting forth his own assessment of the status of the technology employed by the WHISPER device (particularly a statement *affirming* that the said technology had effectively "proven" its ability to accomplish something that had never been accomplished before, in connection with the delivery of ocular medicine to the eye), would have a dramatic impact upon any reasonable investor, in connection with that investor's evaluation of an investment in

17

Corinthian common stock and/or the value of that stock.  As a result, Packer either knew, or was extremely reckless in failing to recognize, the importance of the *accuracy* of the statements attributed to him by the Corinthian Business Plan, in connection with the status of the technology allegedly being employed by the WHISPER™ device.  Nevertheless, based upon the admissions of defendant Corinthian, through the written and oral statements of its Board Chairman, Dr. Fred Eshelman, and those of another Corinthian Board Member, Dr. Ernest Mario, it is now clear that Packer knew or should have known that no "notable technological achievement and…significant advance in clinical ocular therapeutics" had been made by Corinthian, in connection with the WHISPER™ device.  Yet he still permitted the publication in the Corinthian Business Plan of written statements attributable to himself, describing the technology being utilized by the WHISPER™ device as a "notable technological achievement," even though he consciously knew those statements to be false, or he was extremely reckless in failing to determine the falsity of the said statements, and in failing to take action to correct them.

37.    Upon information and belief, Defendant Packer also owned substantial amounts of Corinthian stock himself, at the time the written misrepresentations to Plaintiff in the Corinthian Business Plan attributable to him were made.  There also had been no previous sale of Corinthian stock at the level of $100 per share.  As a result, Defendant Packer had a strong motive to permit written misrepresentations to be made to Plaintiff and other prospective investors in Corinthian stock through the inclusion of those misrepresentations in the Corinthian Business Plan, either consciously or recklessly, because he knew that a sale of Corinthian stock at the level of $100 per share would result in a dramatic *increase* in the price at which the Corinthian stock he already owned could be sold.

**VII. <u>SPECIFIC ORAL MISREPRESENTATIONS MADE TO PLAINTIFF, IN</u>**
**<u>CONNECTION WITH PLAINTIFF'S PURCHASE OF CORINTHIAN STOCK.</u>**

38.     In addition to the written misrepresentations provided to Plaintiff by

Defendants Corinthian and Mark Packer, M.D., through the false statements made to

Plaintiff, its members, and its managing member, Chetan Shah, M.D. in (1) the document

titled "Corinthian Ophthalmic, Inc. Offering Documents" (Exhibit A, filed herewith), and

(2) the document titled "Corinthian Ophthalmic, Inc. Business Plan"  (Exhibit B, filed

herewith), Plaintiff was also provided with oral misrepresentations by Defendants Ballou,

Iancheluv, and Corinthian, at the time its purchase of Corinthian stock was made.

Significantly, like the written misrepresentations described above, these oral

misrepresentations were made to Plaintiff not as "predictions" or "expectations," but instead

as statements of *existing* fact, intended to describe the *existing* technological capabilities of

the WHISPER device, and *existing* interest in the purchase and use of that technology.

39.     At the outset, in or about March of 2012, Defendant Ballou personally

contacted Chetan Shah, M.D., Princeton's Managing Member, to solicit the sale to Princeton

of shares of the common stock of Defendant Corinthian, at a price of $100 per share. As

noted above, at and prior to the time Plaintiff completed its purchase of 19,900 shares of

Corinthian common stock, defendant Ballou was the President of Corinthian, and he was

expressly authorized by the Offering Materials to make representations to prospective

investors on behalf of Corinthian, with respect to Corinthian's stock offering in 2012, and the

WHISPER™ device that formed the subject matter of that offering.  (Exhibit A, at 3).  As a

result, any and all of the oral misrepresentations set forth below that were made by defendant

Ballou, were and are directly attributable to Defendant Corinthian as well.

40.     At the time Princeton's managing member, Chetan Shah, M.D., was first approached by Defendant Ballou, in March of 2012, Defendant Ballou advised Dr. Shah, and another Princeton member, that Defendant Corinthian's WHISPER™ device had the ability to deliver ocular drugs to the eye with a level of consistency, efficiency, and patient comfort far superior to that of a conventional eye dropper.

41.     Later in the spring of 2012, Dr. Shah met with Defendant Ballou in Mercer County, New Jersey, and Ballou showed to Dr. Shah a device he represented to be a "working prototype" of Defendant Corinthian's "WHISPER" device.  Defendant Ballou advised Dr. Shah that the product was "ready" for use, that there was substantial interest in the product on the part of the manufacturers of ocular drugs, and that in fact there was a "bidding war" either in progress, or about to begin, because of the "uniqueness" of the product.

42.     During this same meeting, in the late spring of 2012, Defendant Ballou advised Dr. Shah that the WHISPER™ device had been shown at various trade shows and at meetings with ocular drug manufacturers, and that there was a great deal of interest in the device.  Dr. Shah expressed the belief that, at $100 per share, the price being asked for purchase of shares of Corinthian stock was "too high."  Defendant Ballou advised him, however, that the price was a good one because "there was no more risk in the device," since "the product was complete," and all that remained was for the product to be marketed.

43.     Over the Memorial Day Weekend of 2012, Defendant Iancheluv participated in a conference call with Dr. Sydney Tyson and Dr. Chirag Shah, two members of Princeton Ophthalmic, in which there was further discussion between them regarding the potential for an investment by Plaintiff Princeton in Corinthian, through the purchase of shares of stock in

Corinthian at the price of $100 per share.  During that conference call Defendant Iancheluv, who at the time was a member of Corinthian's Board of Directors, and of its Medical Advisory Board, also emphasized that the WHISPER device was a "finished product," and he referenced testing of the product that had been successfully completed in Mexico.  In addition, he advised Dr. Tyson and Dr. Chirag Shah that glaucoma drop testing and validation was also near completion.

### a. Why The Oral Representations Of Defendants Ballou and Iancheluv Were False.

44.     Nevertheless, despite the misrepresentations to the contrary by Defendants Ballou and Iancheluv, Corinthian's WHISPER product was *not* complete, was far from a "finished product," there had been no "testing" of any significance that had been "successfully completed,"  and the "risk in the device" was actually *extraordinary*, because *none* of its claimed abilities had been demonstrated to actually exist.  In fact, on or about March 25, 2013, less than a year after completing its purchase of Corinthian stock, Plaintiff received a letter from Dr. Fred N. Eshelman, Chairman of Corinthian's Board of Directors, advising Plaintiff and the other Corinthian shareholders, inter alia, that:

> …The way forward may include more time and expense than we had originally anticipated…
>
> On March 14, I was notified that there were major leakage problems with the device, and that none of the drugs (except basically saline/water) passed the tests…
>
> I met with one of the engineers in Raleigh on March 18 to review the situation in detail.  It seems that the drugs were never tested in the sealed device but were only done on open reservoir conditions…
>
>  If Corinthian can produce a complete, working device which passes all functional tests and can be manufactured at scale within cost constraints, I continue to believe that there is value here.

See Eshelman Letter of March 25, 2013 (filed herewith as Exhibit C) (emphasis supplied).

45.     The information contained in this letter from Eshelman, who had just taken over for Defendant Ballou as President and Chief Executive Officer of Corinthian, made it immediately clear to Plaintiff that the oral representations made to its managing member, Chetan Shah, M.D., and to other Princeton members by Defendants Ballou and Iancheluv, asserting that the WHISPER device was a "finished product," and that "there was no more risk in the device," were blatantly false.  This letter also made it clear that what Defendant Iancheluv described as "successful testing," in fact was testing that had actually been a *failure* (i.e., "there were major leakage problems with the device" and "none of the drugs …passed the tests"), or *had never even occurred*.  Id.

46.     Moreover, in a recorded telephone conversation that took place on May 13, 2014, Eshelman and Dr. Ernest Mario, another member of Corinthian's Board of Directors, admitted to Princeton's managing member, Chetan Shah, M.D., and to other members of Princeton who participated in that telephone conversation, that (1) Eshelman and Mario had recognized by December of 2012 that Ballou, and certain members of the Corinthian engineering staff had fraudulently misrepresented the status of the technology, and the testing of the WHISPER device; (2) that Corinthian never had a really firm, controlled device that could actually provide the "dramatic reduction in dosage" they had initially recognized as the most significant value in the WHISPER device; (3) that the claimed "testing" of the WHISPER device had also been substantially or completely fabricated by Ballou and/or certain members of the Corinthian engineering staff; (4) that the claimed ability of the WHISPER device to deliver "preservative-free" ocular drugs had also been misrepresented to them by Ballou, and certain members of the Corinthian engineering staff; and that (5) according to Mario, he had never been "conned" as effectively in his entire life as he had

been conned by Ballou, and the Corinthian employees acting under his supervision, whom he finally realized, as of December of 2012, had effectively defrauded him since the time of his involvement as a member of Corinthian's Board.

**b. Why The Oral Misrepresentations Of Defendants' Ballou and Iancheluv Were "Material."**

47.     The oral misrepresentations of Defendants Ballou and Iancheluv were "material," because Corinthian's interest in its "WHISPER™" device represented the Company's only real asset.  If Plaintiff, or any other reasonable investor, had known that Defendant Corinthian's "WHISPER™" device was *not* based upon *any* "proven" technology, but *solely* upon technology that was completely "*unproven*," and that no valid testing had been completed, with respect to any of the claimed properties of that device, they either would never have purchased Corinthian shares at all, or if they had done so it would not have been at a price of $100 per share, but instead would have been for a fraction of that price on a per share basis, at most.

**c. Facts Giving Rise To A Strong Inference Of Conscious Intent And/or Recklessness, In Connection With The Oral Misrepresentations Of Defendants Ballou and Iancheluv.**

48.     There are numerous facts giving rise to a strong inference of conscious intent and/or recklessness, on the part of Defendants Ballou and Iancheluv, in connection with the oral misrepresentations described above.

49.     To begin with, defendant Ballou was terminated from his position as President of Corinthian, at or around the time Defendant Corinthian effectively admitted, through the letter of March 25, 2013 issued by its Board Chairman, Dr. Fred Eshelman, and in the telephone conversation of May 13, 2015, (1) that the *actual* developmental status of Corinthian's WHISPER device had been misrepresented to Plaintiff as well as to other

prospective investors; and (2) that the Offering Materials had also misrepresented that the Corinthian device was based upon "proven" and "unproven" technology, because in fact *there was no* "proven" technology of any significance being utilized, in connection with the development of the WHISPER device, and virtually every aspect of the WHISPER device misrepresented in the Offering Materials as "existing" and/or "proven," in fact was either completely *nonexistent* or completely *unproven*.

50.     Moreover, at the time of his oral misrepresentations in May of 2012 to Princeton's managing member, Chetan Shah, M.D., Defendant Ballou also stated that he was in possession of a "working model" of the WHISPER™ device.  In fact, however, as noted above, in the recorded telephone conversation of May 13, 2014, Eshelman and Mario admitted to Dr. Chetan Shah that there *had never been* a "working model" of the WHISPER™ device, capable of delivering ocular drugs to the eye in a manner consistent with the claims made by Corinthian regarding that product.  In addition, as also noted above, the extraordinary fact that Eshelman and Mario, in their positions as Corinthian's Board Chairman and Board member, respectively, characterized the activities of Defendant Ballou, in his capacity as President and Chief Executive Officer of Corinthian to be "fraudulent," to involve "conning," and/or words to that effect, also gives rise to a strong inference of conscious intent and/or recklessness on the part of Defendant Ballou, and on the part of Defendant Corinthian, given Ballou's position as President and CEO of Corinthian at the time his fraudulent activities were being engaged in.

51.     Similarly, based upon his status as a member of Corinthian's Board of Directors, and as a member of its Medical Advisory Board, the statements to Plaintiff by defendant Iancheluv prior to Plaintiff's purchase of Corinthian stock, advising Plaintiff that

Corinthian's WHISPER™ device was a "finished product," and that the testing of the product that had been "successfully completed" in Mexico, also give rise to a strong inference of scienter on the part of Defendant Iancheluv, because he either knew that these statements were false at the time they were made, or he was extremely reckless in his failure to determine the falsity of those statements, at the time he made them.

52.     Defendants Ballou and Iancheluv both owned substantial amounts of Corinthian stock themselves, at the time their oral misrepresentations to Plaintiff were made. There also had been no previous sale of Corinthian stock at the level of $100 per share.  As a result, Defendants Ballou and Iancheluv had a strong motive to make oral misrepresentations to Plaintiff, either consciously or recklessly, because they knew a sale of Corinthian stock at the level of $100 per share would result in a dramatic *increase* in the price at which the Corinthian stock each of them already owned could be sold.

## VIII. FACTS RELATING TO PLAINTIFF'S CONTROL PERSON LIABILITY CLAIMS AS TO DEFENDANTS CORINTHIAN, BALLOU, IANCHELUV, AND PACKER.

53.     In a "status report" to Shareholders dated February 18, 2014, Eshelman advised Plaintiff and the other Corinthian shareholders as follows:

> …After finally producing a basic device that works consistently and actually delivers medicines, we marketed the technology to many major eye care companies.

All of these companies declined pursuing any kind of transaction with Corinthian. Eshelman Status Report of 2/18/ 14 (Exhibit D, filed herewith) (emphasis supplied).

54.     The statement set forth above in the Eshelman Status Report of 2/18/2014 (Id.), is yet another acknowledgment of the falsity of the statements contained in the Offering Materials provided to Plaintiff, misrepresenting that by March of 2012 the WHISPER™ device had already "demonstrated" its ability to deliver ocular medicines to the eye "in

consistent and repeatable levels of dosing," and that by March of 2012 Corinthian had

"initiated preliminary discussions concerning its WHISPER™ device with Abbott

Laboratories, Alcon (Novartis AG), Allergan Inc., Bausch & Lomb Inc., Ista

Pharmaceuticals, Pfizer, Inc. and Sun Pharmaceutical Industries, Ltd."  (Exh. B at 10).  That

statement also indicates that both Ballou, Iancheluv, and Packer, as well as other members of

the Corinthian Board either knew at the outset that the statements to the contrary in the

Offering Materials were false, and/or they were extremely reckless in permitting those

statements to be included in the Offering Materials, without verifying their accuracy before

they were distributed to Plaintiff and other prospective Corinthian shareholders, in the spring

and summer of 2012.

### IX. FACTS RELATING TO PLAINTIFF'S CLAIMS FOR BREACH OF FIDUCIARY DUTIES, FRAUDULENT TRANSFER, CONSPIRACY TO VIOLATE THE UFTA, AND ALTER EGO AS WELL AS "SUCCESSOR IN INTEREST" LIABILITY AS TO DEFENDANTS CORINTHIAN AND EYENOVIA.

55.     As noted above, shortly after the acts of securities fraud and common law

fraud described herein occurred, in connection with their sale of assets to Plaintiff,

Defendants orchestrated the sale of virtually all of the assets of Defendant Corinthian (the

"Asset Sale") to a third-party entity, Eyenovia, Inc. ("Eyenovia").  By virtue of the sale of

Corinthian's assets to Eyenovia, Inc. (the "Asset Sale,"), and their own personal relationships

with Eyenovia, upon information and belief Defendants Ballou, Iancheluv, and Packer, as

well as other members of the Corinthian Board, have either preserved or enhanced their own

financial interests, and/or their potential to profit from the successful marketing by Eyenovia

of the WHISPER™ device, in the event that is ever achieved, in a manner far more favorable

to their own interests than to those of Plaintiff and the other Corinthian shareholders.

56.     By virtue of the said Asset Sale, Plaintiff's shares of Corinthian stock either were, or will be converted into shares of the stock of Eyenovia, Inc., representing an ownership interest in Eyenovia, Inc. that is substantially *smaller* than the Plaintiff's ownership interest in Corinthian, thereby substantially *diluting* the value of Plaintiff's shares in Corinthian, and/or rendering them completely worthless.  At the same time, however, even though their shares of stock in Eyenovia are expected to be diluted, on a per share basis, to a degree equal to the dilution of Plaintiff's shares in Corinthian, pursuant to the said Asset Sale transaction Defendants Ballou, Iancheluv, and Packer, and other executives and members of the Corinthian Board of Directors, explicitly admitted in an "Information Statement" provided to Plaintiff on May 23, 2014 (Exhibit E, filed herewith), that the said transaction could be more favorable *to their own interests* than to the interests of other shareholders:

> Some of Corinthian's directors and officers may have interests that differ in several respects from Shareholders [of Corinthian] that may influence them to support or approve the Asset Sale.  Shareholders should note that members of the Corinthian Board may be elected to serve on the Board of Eyenovia after the Asset Sale; specifically, the Memorandum of Terms for Series A Preferred Stock Financing dates as of March 31, 2014 and previously presented to Shareholders contemplates a five-member Board of Directors for Eyenovia, and one of such Directors is anticipated to be Fred Eshelman and one of which will be an independent Director designated by Mr. Eshelman and reasonably acceptable to the other Directors of Eyenovia.  (See Exhibit E, filed herewith).

57.     In fact, precisely as predicted by the Asset Sale "Information Statement" (Id.), Corinthian's Board Chairman, Fred Eshelman, not only became a member of the Board of Directors of Eyenovia, he actually became the Chairman of Eyenovia's Board of Directors, shortly after the Asset Sale transaction occurred.  In addition, upon information and belief one or more of Defendants Ballou, Iancheluv, and Packer, and the other members of Corinthian's Board of Directors, have also become Eyenovia Board members, and each of these Defendants, acting either singly or in concert, is in a far more favorable position to

profit from any success ultimately enjoyed by Eyenovia, than Plaintiff or the other former shareholders of Corinthian.

58.     The Asset Sale, described above, and the subsequent distribution of the Eyenovia stock "exchanged" for the stock of Corinthian, also had the effect of *stripping* Defendant Corinthian of all of its assets, effectively rendering Corinthian insolvent, and has placed Plaintiff in the position where, despite the numerous oral and written misrepresentations made to it in connection with its purchase of Corinthian stock, it will have no means of satisfying any judgment that is obtained in this action against Defendant Corinthian, by reason of the claims arising from those misrepresentations.

59.     Defendant Corinthian and its officers and directors were well aware of the fact that the Asset Sale, and subsequent distribution of the shares of Eyenovia "exchanged" for those of Corinthian in that sale, would have the effect of stripping Defendant Corinthian of all of its assets.  Undoubtedly it was for this reason, and in recognition of the rights of Princeton, as well as their own obligations along with those of Eyenovia, pursuant to the New Jersey Uniform Fraudulent Transfer Act ("UFTA"), that Corinthian's counsel acknowledged, in an email to Corinthian shareholders dated October 26, 2015 (Exhibit F, filed herewith), that they were delaying distribution of the stock of Defendant Eyenovia, Inc. "exchanged" for the stock of Corinthian, "because of the pending litigation filed by Princeton."  (Id. at 2).  Nevertheless, only two days later, on October 28th, 2015, counsel for Defendants Corinthian and Eyenovia, Inc. proceeded to finalize this "exchange," and advised Corinthian's shareholders that they "have received authorization to distribute to the former stockholders of Corinthian the shares of Eyenovia which were received at closing in exchange for your Corinthian stock."  (Exhibit G, filed herewith).  Upon information and

belief, with the finalization of this "exchange," any and all assets of Corinthian have now been transferred to Eyenovia, leaving Defendant Corinthian as a "shell" corporation that is effectively insolvent, with no assets and no means of satisfying any judgment obtained against it in this litigation by Plaintiff.

60.     In light of these facts, the Asset Sale described herein, and the completion of the "exchange" of stock described above, constitutes a direct violation of the UFTA, because it was done with the actual and/or constructive intent to hinder, delay, or defraud Plaintiff, in connection with any indebtedness of Defendant Corinthian to Plaintiff that currently exists and/or will exist, by reason of the claims asserted herein, and the said "exchange" of stock, as well as the Asset Sale described above, were made without Corinthian receiving a reasonably equivalent value in exchange for the transfer of the said stock and/or Assets of Corinthian that Defendant Eyenovia received, and/or for the distribution of Eyenovia stock received to Corinthian shareholders.

61.     In addition, Defendant Eyenovia was part and parcel of a conspiracy that it participated in, together with Defendant Corinthian, to violate the UFTA, because the fraudulent transfer described herein could not have been consummated by Defendant Corinthian *without* the aid and assistance of Defendant Eyenovia.  Moreover, by virtue of the said Asset Sale and "exchange," Defendant Eyenovia became the alter ego and successor in interest of Defendant Corinthian, assumed the liabilities of Defendant Corinthian (Exhibit E at 2), and for these reasons as well is liable for any judgment obtained against Defendant Corinthian in this litigation.

## X. FACTS RELATING TO LOSS CAUSATION

62.     Plaintiff completed its purchase of 19,900 shares of Corinthian shares in two transactions.  On or about June 8, 2012 Plaintiff purchased 10,000 shares of the common stock of Defendant Corinthian, at the price of $100 per share, for a total price of $ 1 million. In addition, on or about June 15, 2012 Plaintiff purchased an additional 9,900 shares of the common stock of Defendant Corinthian, also at the price of $100 per share, for an additional $990,000.  As a result, Plaintiff paid to Corinthian a total of $1,990,000, for purchase of 19,900 shares of its common stock.

63.     Plaintiff made these purchases in reliance upon the written and oral misrepresentations by Defendants, set forth above.  If not for the written and oral misrepresentations made by the Defendants, described in detail above, and had they been aware of the true facts, Plaintiff would not have completed *any* purchase of Corinthian stock or, if they had done so, would have paid only a fraction of the price they actually paid, for purchase of the Corinthian stock that was sold to them, on the basis of the said written and oral misrepresentations set forth above.

64.     At the current time, now that the true facts regarding the *unproven* nature of the technology underlying Corinthian's WHISPER™ device are known, along with the true facts regarding the "testing" that has never actually been completed, Plaintiff's shares of Corinthian stock and/or their diluted shares of Eyenovia are either completely worthless, or at best worth a fraction of the amount that was paid for them by Plaintiff, in reliance upon the oral and written misrepresentations set forth above.  It is therefore clear that Plaintiff has suffered the loss of most, if not all of the $1,990,000 it paid for the purchase of its Corinthian

stock, as a direct and proximate result of the Plaintiff's reliance upon the oral and written misrepresentations described herein, and of the breaches of fiduciary duty described herein.

65.     In addition, the sale of the assets of Corinthian to Eyenovia, and the "exchange" of Corinthian stock for the stock of Eyenovia, have further diluted the value of Plaintiff's shares of Corinthian, and further impeded Plaintiff's prospects for recovery of its losses, through this litigation.  As a result, these fraudulent transfers have also caused, or could cause Plaintiff to suffer the loss of most, if not all of the $1,990,000 it paid for the purchase of its Corinthian stock, unless they are reversed.


## XI. <u>FIRST CLAIM FOR RELIEF</u>

(Section 10(b) of the Securities Exchange Act of 1934, As to Defendants)
Corinthian, Ballou, Iancheluv, and Packer)

66.     Plaintiff re-alleges and specifically incorporates herein by reference the allegations contained in Paragraphs 1 through 65 of this Complaint.

67.     This Claim is based upon Section 10(b) of the Exchange Act, 15 <u>U.S.C.</u> §78j(b), and Rule 10b5 promulgated thereunder, and is asserted by Plaintiff against Defendants Corinthian, Ballou, Iancheluv, and Packer.

68.      At all times relevant these four Defendants, singly and in concert, engaged in, and aided and abetted a plan, scheme and unlawful conspiracy and course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and courses of conduct which operated as a fraud upon plaintiffs, and made various untrue statements of material facts and failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs.  The purpose and effect of said scheme was and is to, among other things,

induce Plaintiff to effectuate the purchase of shares of stock in Corinthian, in amounts far above the true market value of those interests, so as to enrich Defendants at the expense of and detriment of Plaintiff.

69.     At all relevant times, Defendants Corinthian, Ballou, Iancheluv, and Packer, pursuant to said plan, scheme and unlawful conspiracy and course of conduct, and in violation of their (or the controlled person's) duty to Plaintiff, knowingly or recklessly issued and/or caused to be issued, and participated in, the issuance of the false and misleading statements, designed to solicit Plaintiff's consents to the purchase of the stock of Defendant Corinthian, and failed to disclose material facts to the Plaintiff which would have resulted in Plaintiff withholding its consent to the said purchases of Corinthian stock.

70.     By virtue of the foregoing acts, Defendants have violated and/or aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b5 promulgated thereunder, in that they, or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of conduct which operated as a fraud or deceit upon the Plaintiff, in connection with the solicitation of Plaintiff's  consent to the purchase of 19,900 shares of Corinthian stock for a price of $100 per share, of the assets of their  Corinthian partnership interests.

71.     In ignorance of the false and misleading nature of the misrepresentations and omissions described above, Plaintiff relied, to its detriment, upon the materially false and misleading statements referred to herein.  As a direct and proximate result of Defendants' wrongful conduct, the Plaintiff suffered substantial damage.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.

## XII. SECOND CLAIM FOR RELIEF

(Section 20(a) of the Securities Exchange Act of 1934,
as to Defendants Ballou, Iancheluv, and Packer)

72.     Plaintiff re-alleges and specifically incorporates herein by reference the allegations contained in Paragraphs 1 through 71 of this Complaint.

73.     This Claim is based upon Section 20(a) of the Exchange Act, 15 U.S.C. §78t, and is brought by Plaintiffs against Defendants Ballou, Iancheluv, and Packer.

74.     By reason of the conduct detailed above, these Defendants, and each of them, directly or indirectly possessed the power to direct or cause the direction of the management and policies of Defendant Corinthian.  Moreover, these Defendants knowingly and/or recklessly exercised that power, and in doing so either consciously and/or recklessly provided substantial assistance to the other Defendants, including Defendant Corinthian, in the above-referenced violations of Section 10(b) of the Exchange Act, and Rule 10b-5. Accordingly, each of such Defendants is liable as a "controlling person" under 20(a) of the Exchange Act, 15 U.S.C. §78t, in connection with the Solicitation of Consents to the purchase by Plaintiff of the stock of Defendant Corinthian.  As a direct and proximate result of the wrongful conduct of these Defendants, Plaintiff suffered substantial damage as a result of the sale to it of the stock of Defendant Corinthian.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.

## XIII. <u>THIRD CLAIM FOR RELIEF</u>

(Fraud and Deceit, As to Defendants Corinthian, Ballou,
Iancheluv, and Packer)

75.     Plaintiff re-alleges and specifically incorporates herein by reference the allegations contained in Paragraphs 1 through 74 set forth above.

76.     Plaintiff asserts this Claim against Defendants Corinthian, Ballou, Iancheluv, and Packer, for activities they engaged in during all relevant time periods referred to herein.

77.     Beginning in or about March of 2012, Defendants Corinthian, Ballou, Iancheluv, and Packer commenced a common scheme, plan and conspiracy that continues to date.  The primary purpose and effect of the Defendants' conspiracy and scheme was to fraudulently induce Plaintiff to purchase the shares of stock in Corinthian referred to herein, at prices far above their true market value, all for the purpose of generating huge and substantial profits for the Defendants themselves, at the cost and expense of the Plaintiff. Defendants Corinthian, Ballou, Iancheluv, and Packer, and each of them, actively participated in and/or aided and abetted acts in furtherance of this conspiracy including, among other things, inducing Defendant Corinthian to breach its fiduciary duties to Plaintiff, and using Defendant Corinthian, as well as the Corinthian Offering Materials, as vehicles for disseminating false and misleading statements relating to the purchase of interests in the common stock of Corinthian.

78.     Defendants Corinthian, Ballou, Iancheluv, and Packer, individually and in concert, directly and indirectly engaged in, and aided and abetted a common plan, scheme, and continuing course of conduct and conspiracy.  In so doing, these defendants knowingly engaged in acts and transactions to misrepresent and/or omit material facts in their Offering

Circular and Business Plan, as set forth above, which operated as a fraud and deceit upon the Plaintiff, and other Corinthian shareholders.

79.     The materially false and misleading oral statements and omissions made to Plaintiffs at the time of the purchase of the stock of Defendant Corinthian, and in the Offering Materials relating to its purchase of stock in Corinthian, were made by Defendants Corinthian, Ballou, Iancheluv, and Packer, and each of them, with an intent to deceive or defraud Plaintiff, or to aid and abet the deception and defrauding of Plaintiff.  The purpose and effect of Defendants' scheme and conspiracy to defraud was to induce Plaintiff to invest almost $2 million dollars in the purchase of Corinthian stock, so that these Defendants could earn substantial profits by reason of such sale, at the cost and expense of Plaintiff.  Said acts by Defendants Corinthian, Ballou, Iancheluv, and Packer were fraudulent, oppressive, deceitful, and malicious.

80.     Plaintiff, at the time of said misrepresentations and omissions, was necessarily ignorant of these omissions and misrepresentations of material facts, which it believed to be true.  In reliance upon the superior knowledge of Defendants Corinthian, Ballou, Iancheluv, and Packer, Plaintiff invested in Corinthian stock pursuant to a false promise of the opportunity for returns on its funds invested.  If Plaintiff had known the true facts, Plaintiff would never have purchased its share of stock in Corinthian to begin with.  By reason thereof, Plaintiff has suffered, and will continue to suffer, substantial damages.

81.     Defendants Corinthian, Ballou, Iancheluv, and Packer had a duty to fully disclose to Plaintiff all material facts concerning the assets owned, or to be purchased by Plaintiff from Defendant Corinthian, and/or to be sold by it.

82.     In ignorance of the false and misleading nature of the misrepresentations and omissions made to it by these Defendants, Plaintiff has relied, to its damage, on the false, misleading and deceitful misrepresentations made to it by the Defendants at the time of its purchase of its shares of stock in Corinthian.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.

## XIV. <u>FOURTH CLAIM FOR RELIEF</u>

(Negligent Misrepresentation, As To Defendants Corinthian,
Ballou, Iancheluv, and Packer)

83.     Plaintiff re-alleges and specifically incorporates herein by reference the allegations contained in Paragraphs 1 through 82 of this Complaint.

84.     This claim is asserted against Defendants Corinthian, Ballou, Iancheluv, and Packer, for negligent misrepresentation and negligence.

85.      Each of the Defendants made misrepresentations of material facts, and omitted to make material disclosures to plaintiffs through the preparation, publication and dissemination of the Offering Materials utilized to effectuate the sale of Corinthian stock to Plaintiff.

86.     In making said omissions and representations, as well as those described throughout this Complaint, Defendants Corinthian, Ballou, Iancheluv, and Packer omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and made misrepresentations of material fact. Among the direct and proximate causes of said misrepresentations and omissions was the negligence and carelessness of these Defendants.

36

87.     At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true.  In reasonable and foreseeable reliance upon said misrepresentations, in reliance upon the superior knowledge and expertise of these Defendants, and in ignorance of the true facts, Plaintiff was induced to expend almost $2 million for the purchase of 19,900 shares of Corinthian stock.  Had the Plaintiff known the true facts, it would not have taken such action.

88.      As a reasonably foreseeable consequence of such misrepresentations and omissions, Plaintiff's purchases of Corinthian stock were consummated, in June of 2012.

89.      As a result of such negligence, Plaintiff has suffered, and will continue to suffer damages of $1,990,000, the amount of such purchases.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.

## XV. FIFTH CLAIM FOR RELIEF

(Breach Of Fiduciary Duties Against Defendants Ballou, Iancheluv, and Packer)

90.     Plaintiffs reallege and specifically incorporate herein by reference the allegations contained in Paragraphs 1 through 89 of this Complaint.

91.     Defendants Ballou, Iancheluv and Packer and had a fiduciary duty to act in the best interests of the shareholders, in connection with all activities of Corinthian under their supervision and control.  A special relationship of trust and confidence existed between Plaintiff Princeton, as a shareholder of Corinthian, and Defendants Ballou, Iancheluv and Packer, reposing in these Defendants the obligations of that of a trustee acting on behalf of Plaintiff, in all matters relating to that relationship, and to make every reasonable effort to attain the objectives of the said Corporation.

92.     Defendants Iancheluv and Packer breached their fiduciary duties to the Plaintiff and to Corinthian by working instead to consummate the sale of all of the assets of Corinthian to Eyenovia, Inc., ("Eyenovia"), a third party corporation seeking to profit from the fraud and misrepresentations described in this Complaint, and from the financial difficulties encountered by Defendant Corinthian as the result of the said fraud and misrepresentations.  By orchestrating the sale of all of the assets of Corinthian to Eyenovia, Defendants Corinthian, Iancheluv and Packer either substantially diluted, or rendered completely worthless Plaintiff's shares of Corinthian.  At the same time, however, Defendants Iancheluv and Packer orchestrated the said sale of Corinthian's assets to Eyenovia in such a way as to gain more favorable treatment for themselves, and for other officers and directors of Corinthian, than the other Corinthian shareholders could be expected to receive from the said Asset Sale.  In fact, these Defendants have admitted that their own interests may have influenced them to support or approve the Asset Sale to Eyenovia, and that admission gives rise to a strong inference that they either received more favorable treatment, and/or were promised same in the future, at the time the Asset Sale took place.

93.     Through the foregoing acts, practices and course of conduct, Defendants Ballou, Iancheluv and Packer were grossly negligent in failing to use special care and diligence in the exercise of their fiduciary obligations to the plaintiffs.  Defendants Ballou, Iancheluv and Packer have violated, and continue to violate, their fiduciary duty of care to the Plaintiff.

94.     The acts of Defendants Ballou, Iancheluv and Packer, complained of herein, were and are in breach of their fiduciary duty of loyalty to Plaintiff, in that these Defendants knew that their actions involved improper self-dealing, and other acts in derogation of the

38

fiduciary duties owed by them to Plaintiff, as officers and directors of Corinthian, and as the controlling persons of its President, and the members of its Medical Advisory Board.

95.     As a proximate cause of the conduct of Defendants Iancheluv and Packer, in derogation of the fiduciary duties owed by them to Plaintiff, Plaintiff has been damaged, and is entitled to recover an amount which will compensate it for all the detriment proximately caused thereby, whether it could have been anticipated or not.

96.     Moreover, the conduct of Defendants Ballou, Iancheluv and Packer were undertaken maliciously, willfully and in reckless disregard of the rights of Plaintiff, and were intended and directed to harm the Plaintiff, while advancing their own personal interests, thereby entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.


## XVI.  SIXTH CLAIM FOR RELIEF

(Fraudulent Transfer in Violation of the New Jersey Uniform Fraudulent
Transfer Act ("UFTA"), Conspiracy To Violate the UFTA, And Successor-In-Interest
Liability, As To Defendants Corinthian and Eyenovia)

97.     Plaintiff re-alleges and specifically incorporates herein by reference the allegations contained in Paragraphs 1 through 96 of this Complaint.

98.     The Asset Sale described herein, the completion of the "exchange" of stock described above, and the distribution of the stock of Eyenovia to Corinthian shareholders constitutes a direct violation of the New Jersey Uniform Fraudulent Transfer Act. ("UFTA"), because it was done with the actual intent to hinder, delay, or defraud Plaintiff, in connection with any indebtedness of Defendant Corinthian to Plaintiff that currently exists and/or will exist, by reason of the claims asserted herein, and the said "exchange" of stock, as well as the

Asset Sale described above, and the subsequent distribution of Eyenovia stock by Corinthian to its shareholders, were made without Corinthian receiving a reasonably equivalent value in exchange for the transfer of the said stock and/or Assets of Corinthian, that Defendant Eyenovia received, and that was received by Corinthian's shareholders.

99.     Defendant Eyenovia was part and parcel of a conspiracy that it participated in, together with Defendant Corinthian, to violate the UFTA, because the fraudulent transfer described herein could not have been consummated by Defendant Corinthian without the aid and assistance of Defendant.  In addition, by virtue of the Asset Sale described herein, Defendant Eyenovia assumed the liabilities of Defendant Corinthian, and became the successor-in-interest to Defendant Corinthian, thereby rendering Defendant Eyenovia jointly and severally liable for any judgment obtained against Defendant Corinthian in this action.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.


## XVII.  SEVENTH CLAIM FOR RELIEF

(For Imposition of Constructive Trust, As To All Defendants)

100.     Plaintiff incorporates by reference paragraphs 1 through 99 set forth above.

101.     This Claim is asserted against all Defendants, with respect to any and all of the substantial monies obtained from Plaintiff by any and all Defendants by virtue of the fraud, breach of fiduciary duties, and/or negligence described herein, in connection with the Defendants' sale of Corinthian stock to Plaintiff, and the fraudulent transfer of the assets of Defendant Corinthian to Defendant Eyenovia, Inc.

102.     Plaintiff reposed trust and confidence in Defendant Corinthian, as a shareholder of the said corporation, and in the other Defendants as fiduciaries in the

management and operation of Defendant Corinthian.  As a result of their relationship with and control over Defendant Corinthian, all Defendants assumed positions of trust with respect to the stockholders of Defendant Corinthian, as well as to Defendant Corinthian itself.  All proceeds paid, and/or purportedly payable to any of the Defendants in connection with the sale of Corinthian stock to Plaintiff, have therefore been procured in breach of trust.

103.    Plaintiff is the true, sole and equitable owner of those proceeds paid to any and all Defendants in connection with the purchase of its stock in Corinthian, and by virtue of the fraudulent transfer of the assets of Corinthian to Defendant Eyenovia, Inc.  Plaintiff's equitable interests in those proceeds are therefore superior to all others.

104.    Defendants, and each of them, participated in, and aided and abetted, the above described securities laws violations and other wrongful acts with the express intent to obtain monies rightfully belonging to Plaintiff.  As a direct and proximate result of Defendants' wrongful conduct and breaches of trust, Defendants wrongfully acquired substantial sums of monies rightfully belonging to Plaintiff, and of which Defendants are now constructive trustees.

105.    The Defendants have no legal or equitable right or interest in any funds rightfully belonging to the Plaintiff, and are constructive trustees of such funds, owing a duty to transfer same to Plaintiff.

106.    The defendants are, therefore, also constructive trustees of:

a.  All funds received as a result of the purchase of Corinthian stock by Plaintiff.

b.  All management and other salaries and/or fees received from Corinthian, including those authorized, and those not authorized by the articles of incorporation and/or other governing documents of Defendant Corinthian.

c. All of the assets of Corinthian fraudulently transferred to Defendant Eyenovia.

d. All other revenue received by the Defendants, as a result of the wrongful acts complained of herein.

105.    Plaintiffs hereby assert their equitable interests, as described above, and demand the imposition of a constructive trust as to all proceeds so described.

WHEREFORE, Plaintiff prays for the relief as hereinafter set forth.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants and each of them, jointly, severally, or in the alternative, as follows:

A.  Awarding Plaintiff compensatory damages, in the amount of $1,990,000, or such other amount as may be proved at trial, together with prejudgment and post-judgment interest.

B.  Awarding Plaintiff punitive damages, by reason of the wanton, malicious, intentional and/or reckless nature of the wrongs perpetrated against it;

C.  Setting aside any and all fraudulent conveyances of assets by Corinthian to Eyenovia, pursuant to the fraudulent transfers referred to herein;

D.  Declaring Defendant Eyenovia to be the successor-in-interest to the liabilities of Defendant Corinthian to Plaintiff, and therefore jointly and severally liable to Plaintiff, for any judgment obtained by Plaintiff against Defendant Corinthian in this action;

E.  Declaring a constructive trust upon all funds paid or payable to any and all of the Defendants in connection with the purchase by Plaintiff of its shares of stock in Corinthian, in June of 2012;

F.  Requiring an immediate and full accounting of all transactions consummated by any of the Defendants, with respect to the assets of Defendant Corinthian.

F.  Awarding to Plaintiff such other and further relief as this Court may deem proper and just.

LAW OFFICES OF G. MARTIN MEYERS, P.C.
ATTORNEYS FOR PLAINTIFF

Dated:  November 17, 2015               By:  /s/    Gary Martin Meyers            _
                                             Gary Martin Meyers, Esq.  (#5833)


## XVII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all issues as allowed by law.

LAW OFFICES OF G. MARTIN MEYERS, P.C.
ATTORNEYS FOR PLAINTIFF

Dated:  November 17, 2015               By:  /s/    Gary Martin Meyers            _
                                             Gary Martin Meyers, Esq.  (#5833)