NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PRINCETON OPHTHALMIC, LLC, | Civil Action No. 14-cv-05485 (PGS) |
| Plaintiff, | **MEMORANDUM AND ORDER** |
| v. | |
| CORINTHIAN OPHTHALMIC, INC., et al. | |
| Defendants. | |

**SHERIDAN, U.S.D.J.**

This matter comes before this Court on Plaintiff's (Princeton Ophthalmic, LLC) motion for partial summary judgment (ECF No. 85) and Defendants, Skip Ballou, Corinthian Ophthalmic, Inc., Eyenovia, Inc., Sean Ianchulev, Dr. Mark Packer motion for summary judgment (ECF No. 86).

**FACTUAL BACKGROUND**

This is a securities fraud action, arising out of the alleged misrepresentations made by Defendants to Plaintiff in connection with the purchase of 19,900 shares of the common stock of Defendant Corinthian Ophthalmic, Inc. (ECF No. 35).

Plaintiff is a LLC of the State of New Jersey, formed by members who are New Jersey physicians and medical practitioners. Plaintiff was formed for the sole purpose of purchasing shares of stock in Defendant Corinthian. (*Id.* at ¶ 9). Defendant Corinthian is a privately held

medical device firm headquartered in the State of North Carolina with its principal place of business in Boone, North Carolina. (*Id.* at ¶ 10). Defendant Corinthian[1] is the owner of a proprietary ocular drug delivery device, called the "WHISPER™" device. This device allegedly is a technological advancement in the delivery of ocular drugs over the conventional technology. That is, this new device has allegedly "demonstrated" its ability to deliver ocular drugs to the eye with a level of consistency, efficiency, and patient comfort that is far superior to that of a conventional eye dropper. (*Id.* at 3).

In March of 2012, Defendant Corinthian engaged in a $4 million offering of common stocks as a means of raising needed funds from outside investors. (*See* Defendants' Response to Plaintiff's Statement of Material Facts and Defendants' Counterstatement of Material Facts ("DRPSMF") at ¶ 5; ECF No. 90-1). In the course of that stock offering, Plaintiff purchased 19,900 shares of Corinthian stock in June of 2012 for a price of $1,990,000. (Plaintiff's Statement of Material Facts ("PSMF") at ¶ 6). The Corinthian stock offering materials consisted of two written offering documents, which included—(i) Corinthian Offering Documents; and (ii) Corinthian Business Plan (collective referred to "Offering Materials"). Both these documents were issued on March 29, 2012. (PSMF at ¶ 7).

Plaintiff's amended complaint alleges securities fraud in connection with Plaintiff's purchase of common stock in Corinthian based on alleged misrepresentations as to the status of development of the WHISPER™ device. (Def.'s Br. at 1; ECF No. 86-35). Among documents in support of the claims, Plaintiff mentions a letter from Dr. Eshelman dated March 25, 2013, which

---

[1]    Plaintiff initially brought a claim against Defendants Dr. Ernest Mario, Dr. Fred Eshelman, Dr. Mark Packer, and John Hand who are officers and directors of Corinthian. Those defendants were dismissed for failure to state a claim. (ECF 32.) Plaintiff filed an amended complaint on November 11, 2015. (ECF 35.)

was circulated to all Corinthian shareholders, describing the device's "major leaking problems." (Compl. ¶ 25; *See* ECF 35.) Plaintiff also mentions a recorded telephone conversation from May 13, 2014 between Dr. Eshelman and Dr. Mario where it was stated that there was not "a complete working device which pass[ed] all functional tests and can be manufactured at scale within cost constraints." (Id.) Plaintiff asserts Section 10(b) and Rule 10(b)-5 securities claims against Corinthian and Section 20(a) Control Person Liability claims against Defendants Ballou, Ianchulev and Packer. More specifically Plaintiff alleges that Corinthian's Offering Materials dated March 29, 2012 constituted a misrepresentation of material fact in connection with the sale of securities. (Def.'s Br. at 1; *also see* Compl. at ¶¶ 66-74).

## Corinthian Business Plan

The following language and extracts have been taken from Corinthian's <u>business plan</u>, which was issued on March 29, 2012. (ECF No. 85-7). The preliminary statement provided in the business plan is directed towards "forward looking statements," which related to operations that were based on management's "expectations, estimates, and projections" of the company and the medical device industry. As noted below—

> Words such as "expects," "intends," "plans," "projects," "believes," "estimates," "anticipates" and variations of these words and other similar expressions are used to identify such forward looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Further, certain forward-looking statements are based upon assumptions that may not prove to be accurate. Therefore, actual outcomes and results may differ materially from what is expressed or forecast in such forward-looking statements. Corinthian Ophthalmic, Inc. undertakes no obligation, and does not intend to update or revise any forward looking statements, whether as a result of new information, future events, or otherwise. A number of important factors could cause actual results to differ materially from those indicated.

Page 4 of the business plan shows a picture of the device in use and how the delivery of the prescription medicine is administered such that the active ingredient remains longer on the surface of the eye. On page 15 of the business plan, it is noted that the purpose of this device is to use "a proprietary fluid ejector with LED optical alignment to dose ocular drugs in micron-sized droplets without discomfort, irritation or stinging." Thereby, providing greater accuracy, controllability, and drug efficacy per unit volume.



The WHISPER™ device employs advanced droplet physics technology to deliver both high and low viscosity OTC and Rx drugs in far smaller doses than is feasible with an eye-dropper. Corinthian expects that the WHISPER™ device will enhance the bioavailability of topical ocular medications by enabling the active ingredients to remain longer on the surface of the eye. Corinthian also believes that the WHISPER™ device can markedly improve the delivery of many topical ocular drugs, such as anti-glaucoma, anti-allergic, anti-inflammatory, and anti-infection ocular drugs; surgical anesthetics, post-operative antibiotics and dilators; and OTC medications such as dry-eye lubricants and wetting agents. Corinthian expects that the WHISPER™ device

Page 5 of the business plan indicates that Corinthian has to date dosed 41 Rx (prescription) ocular drugs and 40 OTC (over the counter) ocular medications from the WHISPER™ device in non-clinical settings. The business plan also indicates that "Corinthian has conducted an Institutional Review Board (IRB) approved clinical dilatation study using the WHISPER™ device on human subjects at the CODET Vision Institute in Tijuana, Mexico in March 2012" and notes that proof-of-concept studies are very promising.

On page 6 of the business plan, it is noted that Corinthian will be taking additional Institutional Review Board ("IRB") approved clinical studies during the remainder of 2012. The focus of these studies being to show that the device can repeatedly and reliably used to deliver preservative-free topical ocular drugs. The plan recognizes that being able "to avoid preservatives in a topical ocular drug would [] be very appealing to ophthalmologists and physicians."

### Corinthian Offering Documents

The following language and extracts have been taken from Corinthian's <u>Offering Documents</u>, which were issued on March 29, 2012. (Exh. 1-A; *see* ECF No. 86). On page 2, it is noted that the Offering Documents incorporate the Business Plan by reference, as shown below[2]—

**THESE OFFERING MATERIALS DO NOT CONSTITUTE AN OFFER OR A SOLICITATION TO ANY PERSON IN ANY STATE OR IN ANY OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH AN OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THESE OFFERING MATERIALS CONSTITUTE AN OFFER ONLY IF THE COMPANY HAS ENTERED A NAME AND IDENTIFICATION NUMBER IN THE SPACES PROVIDED ABOVE.**

On page 4, Corinthian echoes the preliminary statement provided in the business plan, which is directed towards "forward looking statements," which Corinthian stresses "may or may not prove to be correct." Corinthian also notes that "[n]o representations are made as to the accuracy or reasonableness of such assumptions or of the projections based thereon."

On the same page, Corinthian also emphasizes that "prospective investors are not to construe the contents of these offerings materials or any prior or subsequent communication from the officers or any professional associated with this Offering as legal, tax or investment advice." Corinthian further suggests that investors should consult with their own counsel, accountant and other advisers as to the "matters concerning the investment" and "its suitability for such investors."

---

[2] The Offering Materials refer to both the Business Plan and the Offering Documents. (Exh. 1-A and 1-B; *see* ECF No. 86).

On page 8, Corinthian offers to sell 40,000 shares of its Common Stock at $100 per share, for a total offering of $4,000,000. The offering was set to expire at 5 p.m. EST on May 31, 2012. Each investor had to purchase at least 250 shares ($25,000). Corinthian also notes:

**CORINTHIAN OPHTHALMIC IS CURRENTLY IN THE DEVELOPMENT STAGE AND WILL RELY ON BOTH PROVEN AND UNPROVEN TECHNOLOGY IN ITS BUSINESS ACTIVITIES. ACCORDINGLY, THE SHARES ARE HIGHLY SPECULATIVE, AND INVESTMENT IN THE SHARES INVOLVES A HIGH DEGREE OF RISK. SUBSCRIPTIONS FOR THE SHARES SHOULD BE CONSIDERED ONLY BY PERSONS WHO ARE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT. SEE "RISK FACTORS" ON PAGE 13 OF THIS DOCUMENT FOR INFORMATION THAT INVESTORS SHOULD CONSIDER BEFORE MAKING AN INVESTMENT IN THE SHARES.**

On page 13, Corinthian repeats that the "purchase of the Common Stock . . . involves a high degree of risk and should be regarded as speculative." Prospective investors were instructed to consider various factors relating to the business of the company and the common stock:

- Need to Issue Stock Options
- Need for Additional Funding
- Competition
- Lack of public market; Illiquidity
- Dilution
- Protection of Proprietary Technology; Licensing Uncertainties
- Product Liability Exposure and Potential Unavailability of Insurance
- Absence of Dividends

- Need to Attract and Retain Key Employees

- Accuracy of Financial Data
- Projections
- Company Valuation
- Lack of Profits
- Loss of Investment
- Availability of Information
- North Carolina Income Tax Credit

Most pertinent to the motion at issue here, Corinthian lists the factor "Expectation of Future Losses; Early Stage Company" in its discussion of risk factors, where Corinthian states that the success of the company will depend on the "further development" of its products, as noted below—

***Expectation of Future Losses; Early Stage Company.*** The Company is projecting that net operating losses will continue until at least the first quarter 2013. The Company's ability to generate revenues and profits either before or after such date will depend on the successful licensing of its technology or the further development, commercialization and marketing of its products. Failure of any of these conditions could adversely affect the Company's results of operation.

On page 3 of the Offering Documents, Corinthian states that "there is a degree of economic risk in investing in the Company," and that "investment in the Shares is not suitable for all investors and is not suitable for any investors who cannot bear for an indefinite period the economic risk of the investment." Corinthian also states that "acceptance by the Company of any subscription agreement is not to be construed under any circumstances as a determination that an investment herein is suitable for an investor."

Also, under the "Lack of Sales and Market Recognition" factor, Corinthian states that it has no commercially viable products and it is focused on research and development of the WHISPER™ device.

On page 3 of the Offering Documents, Corinthian instructs investors to examine the Offering Materials carefully, including the merits and risks involved in investment. Corinthian goes on to state that the shares had not been recommended by federal or state securities commissions or regulatory authority, and that the same authorities "have not confirmed the accuracy or determined the adequacy of these offering materials."

On page 36, investors were instructed to sign a Subscription Agreement and affirm that investors relied on the information contained in the Offering Materials and statements or representations that were consistent with the Offering Materials—

(a)        I have received, read and **understand** the Offering Circular dated March 29, 2012 and exhibits thereto, including the Company Business Plan dated March 29, 2012 and exhibits thereto (collectively, the "Offering Documents") and in making this investment I am relying only on the information provided therein. I have not relied upon any statements or representations inconsistent with those contained in the Offering Documents.

## LEGAL STANDARD

### A.  Summary Judgment Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  " [U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to Aset forth specific

facts showing that there is a genuine issue for trial").  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 247-48.  If a court determines, after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

**B.**   **Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Among the rules and regulations promulgated under Section 10(b), Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)   To employ any device, scheme, or artifice to defraud, . . .
>
> (b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person, in connection with the

purchase or sale of any security.

17 C.F.R. § 240.10b-5. Either actual knowledge or recklessness is sufficient to establish scienter

with regard to a misleading statement of current fact, but only actual knowledge of falsity is

sufficient to establish scienter for a forward-looking statement. *Institutional Inv'rs Grp. v. Avaya,

Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) (citation omitted).

In a securities fraud action brought pursuant to Section 10(b) and Rule 10b-5, the basic

elements to be alleged by a plaintiff are: (1) a material misrepresentation or omission by the

defendant; (2) scienter, i.e., a wrongful state of mind on the part of the defendant; (3) in connection

with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases

as "transaction causation;" (5) economic loss; and (6) "loss causation," i.e., a causal connection

between the material misrepresentation and the loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

342 (2005).

a.  *Materiality*

With respect to the first element, that is, the materiality of the statement or omission, there

must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the total mix of the information available.

*In re Advanta Corp.*, 180 F.3d 525, 538 (1999).  Moreover, "the materiality of disclosed

information may be measured post hoc by looking at the movement, in the period immediately

following disclosure, of the price of the firm's stock."  *In re Able Laboratories*, 2008 WL 1967509

at *14 (D.N.J 2008) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (1997).

b. *Scienter*

In order to determine whether scienter allegations can survive a threshold inspection for sufficiency, a court must "engage in a comparative evaluation; it must consider not only inference urged by the plaintiff but also competing inferences rationally drawn from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504-05 (2007). In making this determination, "courts must consider . . . whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509. In actions under Rule 10b-5, a plaintiff may establish the requisite strong inference of scienter by stating either: "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Advanta*, *supra,* 180 F.3d at 534-35. Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp.*, 180 F.3d at 535 (internal quotation omitted).

c. *Loss Causation*

With regard to loss causation, the PSLRA requires plaintiffs in securities actions to carry the burden of "proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The Third Circuit has addressed this issue and found that plaintiffs must show that there is both: (1) a sufficient causal connection between the alleged loss and the alleged misrepresentations; and (2) that the stock price dropped in response to the disclosure of the alleged misrepresentations. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 183-87 (3d Cir.2000). If a plaintiff cannot demonstrate a causal nexus exists between

the stock price drop identified, and the misleading statement or omissions of which the plaintiff complains, a plaintiff has failed carry the burden of proving proximate causation and the claims must be dismissed. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The "causation issue becomes most critical at the proof stage. Whether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir.2000). The Court must view the allegations "in a light most favorable to the Section 10(b) plaintiff" and avoid making determinations on factual issues during a motion to dismiss. *In re MobileMedia Securities Litig.*, 28 F.Supp.2d 901, 940 (D.N.J.1998).

## <u>ANALYSIS</u>

### A. Plaintiff's Partial Summary Judgment Motion

In its motion papers, Plaintiff seeks entry of partial summary judgment in its favor only as to the first and third elements of the Section 10(b) and Rule 10(b)(5). That is, Plaintiff requests judgment as a matter of law on the first and third elements, which include—(i) a material misrepresentation or omission, and (3) a connection with the purchase or sale of a security. (*See* Pl.'s Br. at 33; ECF No. 85-1).

Plaintiff contends that its motion for partial summary judgment should be granted because there is no genuine issue of material fact presented and the interpretation of the parties' experts as to which claims were "forward-looking statements" or statements of existing facts presents purely legal questions for the Court to decide. (Pl.'s Br. at 23; *see* ECF No. 85-1). Plaintiff stresses that but-for Defendants' misrepresentations and omissions, Plaintiff never would have purchased Corinthian stock or would have purchased Corinthian stock at a fraction of the price it paid. (Compl. at ¶34; *see* ECF No. 35). Defendants respond that this Court should deny Plaintiff's motion for partial summary judgment because there are genuine issues of material fact and whether

statements within the Offering Materials are false or misleading is a question of fact to be decided

by the factfinder (citing *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 229 (3d Cir. 2007)

(Def.'s Br. at 3; ECF No. 90).

    i.    <u>First Alleged Misrepresentation or Omission of a Material Fact</u>

       Plaintiff argues that the Defendants misrepresented a material fact that the WHISPER™

device was already able to seal drugs within an internal and non-permeable collapsible reservoir

and that the Defendants knew that the WHISPER™ device was not yet capable of delivering

preservative-free drugs before June of 2012 when Plaintiff purchased Corinthian stock. (Pl.'s Br.

at 18, 22-23; *see* ECF No. 85-1).[3] Plaintiff takes issue with the statement copied below on

pages 6, 38, and 51 of the Business Plan—

> **Because the WHISPER™ device can dose in microliter volumes, seals the drug being delivered within an internal and non-permeable collapsible reservoir, and has a structurally recessed ejector aperture that prevents direct contact of the drug with the user's fingers or eye, Corinthian expects that it will be able to clinically demonstrate that the WHISPER™ device can safely, efficaciously and repeatably deliver preservative-free topical Rx and OTC ocular drugs. Management believes that such an achievement would create substantial economic value for the Company.**

       First, Plaintiff argues that the first portion of the statement above is a representation of

existing fact because it does not include any of the forward-looking statement buzzwords listed in

the Business Plan.[4] (Pl.'s Br. at 17; *see* ECF No. 85-1). Plaintiff contends that the Defendants have

---

[3]    Plaintiff contends that the Defendants knew more about the inadequacies of the WHISPER™ device in May of 2012 when Jonathan Wilkerson, Defendants' Director of Technology and Engineering and one of the researchers who developed the WHISPER™ device, discovered that air was being sucked into the reservoir where the drugs were contained, which contaminated the drugs therein. (Pl.'s Br. at 18, 22-23; *see* ECF No. 85-1)

[4] Page 2 of the Business Plan lists words that signify that a statement is forward-looking: "Words such as 'expects,' 'intends,' 'plans,' 'projects,' 'believes,' 'estimates,' 'anticipates,' and variation of these words and other similar expression are used to identify such forward-looking statements." Defendants argue that this list is not exclusive because the language does not state that all forward-looking statements are identified with the words listed. (Def.'s Br. at 8; *see* ECF No. 90)

admitted this statement was never accurate as to the existing engineering abilities of the WHISPER™ device because the WHISPER™ device did not have the capability to "dose" medication and the reservoir had leakage problems. (*Id.*).[5]

Second, Plaintiff maintains that the descriptions of the device's capabilities are representations of existing fact because Defendant Corinthian used the present tense. (*Id.* at 18.) "[A] mixed present/future statement is not entitled to the [Private Securities Litigation Reform Act (PLSRA)] safe harbor with respect to the part of the statement that refers to the present" (citing *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (citation omitted);15 U.S. Code § 78u–5)). (*Id.* at 19.)

Plaintiff argues that the Defendants' failure to disclose that the WHISPER™ device could not effectively "seal" drugs within the reservoir or dose medication does not come within the PSLRA's safe harbor because these misrepresentations or omissions relate to the non-forward-looking aspects of the statement "Because the WHISPER™ device can . . . ," not the forward-looking statement that "Corinthian expects that it will be able to clinically demonstrate . . ." (*Id.*)

Defendants maintain that the Offering Materials should be considered in context and in their entirety, rather than selecting isolated words or phrases (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 384 (3d Cir. 1993)). (Def.'s Br. at 8; *see* ECF No. 90). The Defendants argue that the statement "we are designing an ocular drug delivery device that can dose in microliter volumes, seals the drug being delivered within an internal and non-permeable collapsible reservoir, and has a structurally recessed ejector aperture that prevents direct contact

---

[5] Plaintiff may be referring here to Dr. Eshelman's March 25, 2013, letter which described the device's "major leaking problems" and the recorded telephone conversation on May 13, 2014, between Defendants Eshelman and Mario where it was stated that there was no ""a complete, working device which passes all functional tests and can be manufactured at scale within cost constraints." *See* Compl. at ¶26-27; *see* ECF No. 35).

of the drug with the users fingers or eye" cannot reasonably be taken as a representation that all capabilities described are already fully developed, tested, and ready for use. (*Id*. at 10). Defendants argue that these present tense descriptions were predictions of future performance – the product features were being designed, developed, and tested — subject to the safe-harbor provisions of 15 U.S.C. § 78u-5(c) (PSLRA) (citing 1 U.S.C.S. § 1 (Dictionary Act); *Baker v. Otis Elevator Co.*, 609 F.2d 686, 693 (3d Cir. 1979); *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 59 (1987)). (*Id*.).

Plaintiff responds that general cautionary language within the Offering Materials, as a whole, does not render the statement at issue immaterial or transform it into a forward-looking statement (citing *EP Medsystems*, 235 F.3d at 874). (Pl.'s Br. at 19; *see* ECF No. 85-1). Additionally, Plaintiff maintains that even if the statement at issue was forward-looking, the statement is not entitled to protection under the "bespeaks caution" doctrine because the cautionary statements in the beginning of the Offering Materials were not "substantive and tailored to the specific" misrepresentations at issue (citing *EP Medsystems*, 235 F.3d at 873 (citation omitted)). (*Id*. at 20-21).

Third, Plaintiff asserts that the Defendants had the duty to disclose all facts necessary to render the statements made on a particular subject in the Offering Materials "not misleading" because Defendants made "an inaccurate, incomplete or misleading prior disclosure" (citing *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). (Pl.'s Br. at 21-22; *see* ECF No. 85-1).

ii.   Second Alleged Misrepresentation or Omission of a Material Fact

Plaintiff claims that the Defendants misrepresented that the WHISPER™ device had "successfully dosed" 81 of the most popular ocular drugs and that the Defendants knew that this representation was false because only a component of the device called the atomizer was tested,

rather than a prototype of the WHISPER™ device, and the Defendants had only "sprayed" some of those 81 drugs, rather than accurately dosed these drugs. (Pl.'s Br. at 23; *see* ECF No. 85-1).

Plaintiff relies on *Securities v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300 (D.D.C. 2015), as a comparable case in which present tense descriptions of capabilities of a device under development were found to be misrepresentations and misleading. (*Id.* at 25-26.) Defendants contend that *e-Smart Technologies* can be distinguished from this case. (Def.'s Br. at 11-13; *see* ECF No. 90). In *e-Smart Technologies*, the court granted summary judgment because the defendant's express claims that it had a commercially available product were false and misleading, but the court declined to grant summary judgment where the features of the defendant's product were described as "under development." (*Id.*) The Defendants assert that Corinthian clearly stated in the Offering Materials that the device was not commercially available and was in the "proof of concept" stage. (*Id.*)

### B. Defendants' Motion for Summary Judgment

Defendants move before this Court to enter judgment as a matter of law on Plaintiff's entire complaint, which includes—securities fraud (Section 10b), control person liability (Section 20(a)), fraud and deceit, breach of fiduciary duty, fraudulent transfer in violation of NJ Uniform Fraudulent Transfer Act, and negligent misrepresentation.

I. <u>First Claim for Relief: Section 10(b) of the Securities Exchange Act of 1934, As to Defendants Corinthian, Ballou, Ianchulev, and Packer</u>

Defendants argue that this Court should grant its motion for summary judgment with regard to Plaintiff's Section 10(b) and Rule 10(b)(5) claims.

### a) **Material Misrepresentations or Omissions**

Plaintiff argues that the Business Plan's descriptions of the device's capabilities was inaccurate because the device could only physically spray and could not dose medication in precise

desired volumes. (Pl.'s Br. at 3; *see* ECF No. 91). Moreover, Plaintiff highlights that 1) Defendants' Director of Technology and Engineering, John Wilkerson, admitted that only 10-20% of WHISPER™ device had sprayed water in desired quantities by early 2012 and 2) Defendant Skip Ballou, the President and CEO of Corinthian in March of 2012, admitted that most of the 81 popular drugs listed in the Business Plan had never been dosed and several of these drugs had never even been sprayed. (Pl.'s Br. at 4; *see* ECF No. 91).

The Defendants argue that there was no misrepresentation as to the device's development status. (Def.'s Br. at 5; *see* ECF No. 86-35). The Defendants reject this spray-dose distinction and argue that (1) the drugs in question were dispensed successfully through the WHISPER™ device's ejector mechanism and (2) the WHISPER™ device had successfully dosed ocular medications, which the Defendants define as dispensing a measured amount of a drug through the device's ejector mechanism. (*Id.*) The Defendants submit that the only engineering issues of the WHISPER™ device were the sealed ampoule necessary to make the device compliant with the FDA's requirements for preservative-free multi-dose dispensers and the development of reliable, high-yield manufacturing methods for the device's components.[6] (*Id.*) Defendants set forth that when the Business Plan is read in context, the Business Plan contains no indication that the engineering or manufacturing problems were solved or the device's capabilities were fully developed and tested. (*Id.*) Defendants further contend that the Business Plan describes the tests conducted on the WHISPER™ device as "proof of concept" studies, which is a very early stage in the development of a medical device and would be recognized by anyone who was familiar with

---

[6] The Plaintiff directly counters this assertion by stating that Dr. Eshelman's March 25, 2013, letter that the leakage problems arose despite "cleanups and ampoule/ejector refinements" that were "non-PFMD [preservative-free multi-dose delivery] in nature and origin." Pl.'s Br. at 9; *see* ECF No. 91.

early stage biomedical device companies or who had a medical background. (*Id.*) Defendants argue that, when taken as a whole, the Business Plan states that the Defendants had no commercially viable products and describes a device in the earliest "proof-of-concept" stage of development, not one that is completely developed and ready for FDA approval. (*Id.*)

### b) **Scienter**

Defendants argue that the Plaintiff has not shown the requisite level of scienter required by securities law. This section will address each of the claimed misrepresentations individually.

> a. *"41 prescription and 40 over-the-counter ocular drugs had been 'successfully dosed' using WHISPER™"* (Compl. at ¶ 23; *see* ECF No. 35).

Plaintiff argues that the Defendants' spraying of 81 drugs listed in the Business Plan cannot be described accurately as dosing because the testing involved only spraying in non-predetermined and unmeasured amounts. (Pl.'s Br. at 24-25; *see* ECF No. 91).

Defendants argue that the statement above was not reckless or false because Defendant Ballou relied on reports of Corinthian's development engineers as to the number of ocular drugs which had been successfully sprayed by the device, which was constantly evolving as the device was modified, when he prepared the Offering Materials. (Def.'s Br. at 22; *see* ECF No. 86-35). Defendants also set forth that Johnathan Wilkerson testified that the device had the ability to control the volume and timing of the spray since January 2011. (Def.'s Reply at 4; *see* ECF No. 95; *see also* Def.'s Stmt. of Facts at 14; *see* ECF No. 90-1).

The Defendants also reject Plaintiff's allegations that leakage problems with the WHISPER™ device existed when the March 29, 2012, Business plan was prepared because Dr. Eshelman's March 2013 letter referred to modifications to a later device that had caused the device to be unable to successfully spray drugs that had been sprayed successfully by the prior version.

(Def.'s Br. at 22; *see* ECF No. 86-35). Leakage problems surfaced when testing of actual medications with sealed ampoules began, as opposed to the open reservoir testing that had been conducted with specific medications previously. (Def.'s Stmt. of Facts; *see* ECF No. 95-1). The problems were solved within three months of identification. *Id*. Defendants stress that the focus of the development effort was to perfect the ability of the device to spray various drugs with varying sealed ampoule and open reservoir designs. (Def.'s Reply at 4; *see* ECF No. 95). Defendants emphasize that the Plaintiff lumped two different development issues under the rubric of "leakage," which Johnathan Wilkerson worked on from March 2012 to April or May 2012: 1) "electrowetting" where "fluid being ejected is attracted to the interior surface of the ejector and caused to drip from the ejector nozzle" and 2) "beading" where "ejected droplets reform on the nozzle, causing a bridge over which fluid in the device can leak out." (Def.'s Reply at 5; *see* ECF No. 95).

b. *"The WHISPER™ device can dose high viscosity ocular treatments including Restasis® 'right out of the box' without reformulation or adjustment to the viscosity medium."* (Compl. at ¶ 23; *see* ECF No. 35).

The Defendants claim that this statement was not knowingly or recklessly false when made because Defendant Packer conducted a study dated October 31, 2011, where Restasis® was sprayed into patients' eyes using the device. (Def.'s Br. at 23; *see* ECF No. 86-35). Defendants explain that Plaintiff refers to a list dated July 11, 2011, where Restasis® was not successfully dispensed. (Def.'s Stmt. of Facts at 2; *see* ECF No. 95-1). However, Defendants state that Restasis® was successfully dispensed by May 16, 2012. *Id*.

c. *"The WHISPER™ can dose in microliter volumes, seals the drug being delivered within an internal and non-permeable collapsible reservoir, and has a structurally recessed ejector aperture that prevents direct contact of the drug with the user's finger or eye."* (Compl. at ¶ 23; *see* ECF No. 35).

Defendants claim that, when read in context, this statement is a forward-looking statement because it describes the product's intended capabilities. (Def.'s Br. at 23; *see* ECF No. 86-35). Defendants submit that this statement was not knowingly false or reckless because it was true that the device dosed [meaning, dispensed a measured amount of a drug through the device's ejector mechanism], used a sealed ampoule, and had a recessed aperture (citing *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) (citation omitted); 15 U.S.C.S. 78u-5(c)(1)(B)). (*Id*. at 24). Defendants set forth that, even if this statement was a statement of presently existing fact, the characteristics described in the Business Plan existed in the device. (*Id*. at 25.)

Plaintiff maintains that sometime before Corinthian closed on its sale of stock to Plaintiff, the Defendants were well aware that the WHISPER™ device could not seal drugs within an internal and non-permeable collapsible reservoir from March of 2012 through May of 2013 and this fact remained known to some or all of Corinthian executives and board members for at least eight months past the June 2012 closing on Corinthian's sale of stock to Plaintiff. (Pl.'s Br. at 29; *see* ECF No. 91).[7]

Defendants counter that there is no evidence of active concealment because the Defendants disclosed their discovery about the status of development within eleven days of first discovering development problems by sending the Plaintiff a letter from Dr. Eshelman on March 25, 2013 (citing *Rahman v. Kid Brands*, 736 F.3d 237, 246 (3d Cir. 2013)). (Def.'s Reply at 13; *see* ECF No. 95).

---

[7] (*See* Exh. F, Wilkerson Dep., Tr. 31:11-17; Exh. G, Pines Report at 10, ¶ 36).

      d.   *Plaintiff claims that "Defendant Ballou advised Dr. Shah, and another Princeton member, that Defendant Corinthian's WHISPER™ device had the ability to deliver ocular drugs to the eye with a level of consistency, efficiency, and patient comfort far superior to that of a conventional eye dropper."* (Compl. at ¶ 40; *see* ECF No. 35).

Defendants contend that this statement describes characteristics that were designed into the device from the beginning and were demonstrated in proof-of-concept studies. (Def.'s Br. at 25; *see* ECF No. 86-35). In the alternative, if this Court does not find this statement to be forward-looking, Defendants argue that the statement is accurate and is based on evidence of actual test results from the CODET Study attached to the Business Plan. (*Id.* at 26.)

      e.   *Plaintiff claims that Defendant Ballou "showed to Dr. Shah a device he represented to be a 'working prototype' of Defendant Corinthian's 'WHISPER™' device" and "advised Dr. Shah that the product was 'ready' for use, that there was substantial interest in the product on the part of the manufacturers of ocular drugs, and that in fact there was a 'bidding war' either in progress, or about to begin, because of the 'uniqueness' of the product."* (Compl. at ¶ 45; *see* ECF No. 35).

Defendants reject Plaintiff's claim that the device was represented as "ready for use" because Defendant Ballou testified that he showed the device, sprayed saline, described it as a prototype, stated that it could spray several materials, and explained that there was a lot more to do and additional investment would likely be required. (Def.'s Br. at 26; *see* ECF No. 86-35). Defendants argue that there is no evidence that Defendant Ballou made this statement with knowledge that it was false because (1) the comment about the bidding war is a forward-looking statement and, at worst, sales puffery, (2) a number of major pharmaceutical manufacturers met with Corinthian about the device around the time when Plaintiff invested, and (3) the product's uniqueness is undeniable. (*Id.* at 27.)

     f. *Plaintiff claims that Defendant Ballou stated to Dr. Shah that the $100 per share price for Corinthian stock "was a good one because 'there was no more risk in the device,' since 'the product was complete,' and all that remained was for the product to be marketed."* (Compl. at ¶ 42; *see* ECF No. 35).

Defendants deny that Defendant Ballou made the statement above and stated that the device was a prototype, which is consistent with the Business Plan which described the completed studies as "proof of concept." (Def.'s Br. at 27; *see* ECF No. 86-35).

     g. *Plaintiff claims that Defendant Sean Ianchulev "also emphasized that the WHISPER™ device was a 'finished product,' and he referenced testing of the product that had been successfully completed in Mexico. In addition, he advised Dr. Tyson and Dr. Chirag Shah that glaucoma drop testing and validation was also near completion."* (Compl. at ¶ 43; *see* ECF No. 35).

Defendants deny that Defendant Ianchulev made the statement above and stated that the device was a prototype, which is consistent with the Business Plan which described the completed studies as "proof of concept." (Def.'s Br. at 28; *see* ECF No. 86-35).

    **c)**   **Reasonable Reliance**

 "The reasonable reliance element of a Rule 10b-5 claim requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003 (citation omitted). Courts should consider:

(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information.

*Id.* at 178-79.

Defendants argue that the Plaintiff has not shown reasonable reliance on any claimed misrepresentations with regard to the June 2012 investment or the 2013 purchase of convertible notes. (Def.'s Br. at 10; *see* ECF No. 86-35).

i.    2012 Stock Purchase

Defendants highlight that the Plaintiff purchased Corinthian stock without doing any independent investigation, despite instructions in the Offering Materials to seek further information about the device's development in confidential documents, disclaimers in the Offering Materials, statements in the Business Plan that the product was in an early "proof-of-concept" stage of development, and statements in the Offering Document that investors were required to rely on their own investigation of Defendant Corinthian. (Def.'s Br. at 11-12; *see* ECF No. 86-35).[8] Moreover, Defendants submit that the Plaintiff consists of ophthalmologists, physicians, an electrical engineer, and a licensed financial advisor, who were uniquely qualified to examine and understand the status of the development efforts. (*Id.*)

Plaintiffs claim they made no independent investigation of Corinthian before investing because they relied on oral statements from Defendant Ballou who stated the product was "fully developed" and Defendant Ianchulev who described the device as a "finished product." (*Id.* at 13.) However, Defendants counter that Defendant Ballou stated that the device was in a "proof-of-concept" stage and Defendant Ianchulev stated that the device was a prototype. (*Id.* at 15.)

---

[8] Plaintiff also failed to take the basic step of signing a Non-Disclosure Agreement, which would have enabled Plaintiff to visit the Corinthian lab, speak with the engineering team, and review test data. (Def.'s Reply at 6; *see* ECF No. 95).

Defendants submit that neither of these two defendants had fiduciary or long-standing business or personal relationships with members of the Plaintiff. (*Id*. at 13.) Defendants also argue that the Plaintiff consists of sophisticated investors, who have made prior investments in private ventures and who had the ability to evaluate Corinthian's product, its development status, and its likely prospects. (*Id*. at 14.) Defendants also set forth that Plaintiff was directly involved with the management and operation of Corinthian within two months of Plaintiff's June 2012 investment in Corinthian stock because Plaintiff had representatives on the Corinthian medical advisory board. (*Id*.)

ii.    2013 Convertible Note Purchase

Defendants argue that Plaintiff has not established that it relied on misrepresentations in making its 2013 purchase of $130,000 of Corinthian convertible notes because Plaintiff knew that there were leakage problems in the latest design of the device, which were described in Dr. Eshelman's March 25, 2013 letter, before proceeding with the purchase of convertible notes. (*Id*. at 17.) Plaintiff counters that it had agreed to purchase Corinthian convertible notes two months before receiving Defendant Eshelman's 2013 letter and purchased the convertible notes to avoid a complete loss of their investment in Corinthian stock. (Pl.'s Br. at 23; *see* ECF No. 91).

Plaintiff also asserts that Defendants explicitly denied Plaintiff's members with access to the WHISPER™ device and that the oral representations by Defendants Ianchulev and Ballou cemented the misrepresentations already made in the Business Plan. (*Id*. at 19.)[9] Plaintiff also adds that it is specious to suggest that any amount of reasonable due diligence would have succeeded in uncovering the falsity of the misrepresentations and omissions that Plaintiff relied upon because

---

[9]    Defendants argue that Plaintiff fails to make it clear that the denied request by Plaintiff's Dr. Chetan Shah was to try the device out on some patients at the office of his brother, ophthalmologist Chirag Shah. (Def.'s Reply at 6; *see* ECF No. 95).

Corinthian executives were defrauded by other Corinthian executives and they themselves were unable to uncover that fraud until the end of 2012. (*Id*. at 22.)[10]

### d) **Loss Causation**

The Defendants stress that Princeton's $525,905-$1,200,000 holding in Eyenovia, which is valued between $29 million and $56 million,[11] will be worth significantly more when FDA Phase III trials begin. (Def.'s Br. at 29; *see* ECF No. 86-35).[12] Defendants submit that the Plaintiff cannot show that Corinthian caused the Plaintiff to overpay for Corinthian stock because the Offering Materials stated that 1) investment was risky, 2) Corinthian was a startup with a prototype device at the proof-of-concept stage, 3) Corinthian's technology was unproven, and 4) investment was suitable only for investors who could afford to lose their entire investment. (*Id*.) Defendants also stress that Plaintiff was fully capable of understanding the technology and medical science behind the device and that the FDA would need to validate and approve the device.[13] (*Id*. at 30).

Plaintiff counters there is a direct causal connection between Plaintiff's shares diminishing in value, the misrepresentation in the Corinthian Business Plan regarding the developmental and engineering status of the WHISPER™ device, and the major "leakage" problems encountered when the medications finally were tested which led to a lost marketing opportunity with Alcon[14]

---

[10]     This is in reference to a call on May 13, 2014, where Defendant Mario stated that he felt "conned" by Ballou as to the device's engineering capabilities. (See Compl. at ¶ 46; *see* ECF No. 35).

[11]      Plaintiff questions Defendants' assertion that Eyenovia is worth $29 million and $56 million when the company only raised $10 million in its first two years of operations and expects to spend $6-7 million quarterly. (Def.'s Br. at 29; *see* ECF No. 86-35)

[12]     On October 28th, 2015, counsel for Defendants Corinthian and Eyenovia, Inc. proceeded to finalize an "exchange" of Corinthian shares to Eyenovia. (Compl. at ¶ 59; *see* ECF No. 35).

[13]     Plaintiff consists of ophthalmologists, physicians, an electrical engineer, and a licensed financial advisor.

[14]     Alcon is an American global medical company specializing in eye care products and headquartered in Hünenberg, Switzerland.

(citing *Pure Earth, Inc. v. Call*, 531 Fed. Appx. 256 (3d Cir. 2013) (citation omitted). (Pl.'s Br. at 33; *see* EC No. 91). Plaintiff also submits that Plaintiff sustained "out of pocket" damages between $1,791,000 and $1,890,500 of its $1,990,000 investment in Corinthian.[15] (*Id.* at 35.) Plaintiff contends that its shares were never worth more than ten percent of the purchase price when it purchased Corinthian stock. (*Id.*)

## II. Second Claim for Relief: Section 20(a) of the Securities Exchange Act of 1934, As to Defendants Ballou, Ianchulev, and Packer

To establish control person liability, a plaintiff must show: "(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 644-45 (D.N.J. 2003) (citations omitted). To establish that a defendant is a control person, a plaintiff must demonstrate that the defendant had "actual power or influence over the allegedly controlled company." (*Id.*)[16] Control person liability will not be found when the controlling person "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C.S. § 78t(a). A plaintiff must establish that the defendants were "in some meaningful sense culpable participants in the

---

[15] The "out-of-pocket rule" calculates damages as "the difference between the price paid for a security and the security's 'true value' at the time of purchase." *Pure Earth, Inc. v. Call*, Fed. Appx. 256, 260 (3d Cir. 2013) (citation omitted).

[16] 15 U.S.C.S. § 78t(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title [15 USCS §§ 78a et seq.] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 21(d) [15 USCS § 78u(d)]), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

fraud perpetrated by controlled persons." *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d, 589, 623 (D.N.J. 2001).

Plaintiff contends that it has proven the Defendants committed a violation by misrepresenting material facts about the device's capabilities and Defendant Ballou qualifies as a control person because he was the President of Corinthian in March of 2012. The Defendants argue that although Defendant Ballou was Corinthian's CEO at the time of the preparation of the Offering Materials and Plaintiff's purchase of Corinthian stock, he does not have control person liability because Corinthian did not commit any violation and Defendant Ballou did not act in good faith. (Def.'s Br. at 32; *see* ECF No. 86-35).

Plaintiff further maintains that Defendants Ianchulev and Packer qualify as control persons because both were Corinthian Board of Directors members and Corinthian Medical Advisory Board members. (Pl.'s Br. at 36; *see* ECF No. 91). However, Defendants contend that the Plaintiff has not shown that a position on the Medical Advisory Board or a position as an outside direct gave Drs. Ianchulev and Packer "actual power or influence" over the corporate actions of which Plaintiff complains. (Def.'s Reply at 11; *see* ECF No. 95).

III.   Third Claim for Relief: Fraud and Deceit, As to Defendants Corinthian, Ballou, Ianchulev, and Packer

Common law fraud and deceit claims require a plaintiff to prove: 1) a material representation of a presently existing or past fact, 2) made with knowledge of the representation's falsity and with the intention that the other party rely on this representation, 3) which results in reliance by that party 4) to that party's detriment. *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624 (1981). "The knowledge and intent requirements of a common law fraud claim are consistent with the scienter requirement of § 10(b)" (citing *Silverman v. Ernst & Young, LLP*, 1999 U.S. Dist. LEXIS 17703 Unpub. at *31 (D.N.J. 1999) (citations omitted)).

The Defendants argue that the Plaintiff has not produced any evidence to establish Plaintiff's claim for common law fraud and deceit. (Def.'s Br. at 32; *see* ECF No. 86-35). Plaintiff contends that the Plaintiff has provided sufficient proof of the Defendants knowledge that their representation regarding the engineering capabilities of the WHISPER™ device was false when the Offering Materials were provided to the Plaintiff. (Pl.'s Br. at 22-23; *see* ECF No. 85-1).

IV. <u>Fourth Claim for Relief: Negligent Misrepresentation, As to Defendants Corinthian, Ballou, Ianchulev, and Packer</u>

Defendants maintain that the Plaintiff cannot establish its claim for negligent misrepresentation because none of the elements are satisfied. (Def.'s Br. at 33; *see* ECF No. 86-35). To prove a claim of negligent misrepresentation under New Jersey law, the plaintiff must demonstrate that: 1) the defendant negligently provided false information; 2) the plaintiff was a reasonably foreseeable recipient of that information; 3) the plaintiff justifiably relied on the information; and 4) the false statements were a proximate cause of the plaintiff's damages. Scienter is not a required element of negligent misrepresentation (citing *Cohen v. Telsey*, 2009 U.S. Dist. LEXIS Unpub 101696 at *52 (D.N.J. 2009) (citation omitted)). (*Id.*)

V. <u>Fifth Claim for Relief: Breach of Fiduciary Duties Against Defendants Ballou, Ianchulev, and Packer</u>

Plaintiff claims that Defendants Ballou, Ianchulev, and Packer had a fiduciary duty to act in the best interests of Plaintiff, as a shareholder of Corinthian. (Amended Compl. at ¶ 92; *see* ECF No. 35). Plaintiff further argues that the Defendants breached this duty by engaging in improper self-dealing and failing to act in the best interests of Plaintiff when the Defendants sold Corinthian's assets to Eyenovia, a company that sought to profit from the financial difficulties encountered by Defendant Corinthian as the result of its fraud and misrepresentations, and rendered Plaintiff's shares almost worthless. (*Id.*) As a proximate cause of the conduct of

Defendants, Plaintiff alleges it has been damaged and is entitled to a remedy. (Compl. at ¶ 95; *see* ECF No. 35).

The Defendants contend that no facts support Plaintiff's allegation that Defendants Ballou, Ianchulev, or Packer breached their fiduciary duties to Corinthian or its shareholders by working to sell Corinthian's assets to Eyenovia. (Def.'s Br. at 35; *see* ECF No. 86-35). Defendants concede that Dr. Ianchulev is the Chairman of Eyenovia and receives $700 per hour for consulting fees, but stress that Dr. Packer and Defendant Ballou are shareholders of Eyenovia with no other involvement with Eyenovia.[17] (*Id.*) Defendants argue that the sale to Eyenovia was the only alternative to allowing Corinthian to shut down completely for lack of funds and this sale preserved Plaintiff's shareholder equity because Eyenovia has attracted substantial investments and the company's value is expected to increase significantly when the WHISPER™ device enters FDA Phase III clinical trials. (*Id.*)

VI.    Sixth Claim for Relief: Fraudulent Transfer in Violation of the New Jersey Uniform Fraudulent Transfer Act ("UFTA"), Conspiracy to Violate the UFTA, and Successor-in-Interest Liability, As to Defendants Corinthian and Eyenovia

"[T]he purpose of the fraudulent conveyance statute is to prevent insolvent debtors from placing their property beyond the reach of their creditors while at the same time enjoying the benefits thereof." *SEC v. Antar*, 120 F. Supp. 2d 431, 445 (D.N.J. 2000) (citations omitted)).

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

---

[17] However, Dr. Packer received a consulting fee of $2,000 for a twelve-month period in 2012 from Eyenovia. (Def.'s Br. at 35; *see* ECF No. 86-35).

    a.      With <u>actual intent</u> to hinder, delay, or defraud any creditor of the debtor; or

    b.      Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J.S.A. § 25:2-25 (emphasis added). In determining actual intent, consideration may be given to whether:

    a.      The transfer or obligation was to an insider;

    b.      The debtor retained possession or control of the property transferred after the transfer;

    c.      The transfer or obligation was disclosed or concealed;

    d.      Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    e.      The transfer was of substantially all the debtor's assets;

    f.      The debtor absconded;

    g.      The debtor removed or concealed assets;

    h.      The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    i.      The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j.     The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k.     The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. § 25:2-26.

The Defendants concede that two factors are present: the transfer was of all of Corinthian's assets, and Corinthian had no funds to continue its operations at the time of the sale to Eyenovia because Corinthian failed to raise additional funds. (Def.'s Br. at 37; *see* ECF No. 86-35).

The Defendants first argue that the transfer was not to an insider because although Defendant Ianchulev arranged for new investors to invest an additional $15.7 million in Eyenovia to continue developing the device. (*Id*.) However, it is recommended that this Court find Defendant Ianchulev to be an insider because he 1) is the current Chairman of Eyenovia and the former Director of Corinthian's Medical Advisory Board, 2) arranged for the sale of Corinthian's assets, 3) joined Eyenovia's Board of Directors, 4) purchased additional stock in Eyenovia, and 5) earns consulting fees. (Pl.'s Br. at 39; *see* ECF No. 91).

Defendants also maintain that the asset purchase transaction was transparent to Corinthian's stockholders, and Corinthian's stockholders received approximately $5 million of value as Eyenovia stockholders for their prior investments in Corinthian. (Def.'s Br. at 38; *see* ECF No. 86-35).

Defendants stress that the Defendants preserved Plaintiff's investment by bringing in new funds to continue the development of the product and Defendants did not fraudulently transfer assets to hinder creditors or otherwise disadvantage Plaintiff. (*Id*.) Defendants claim that Corinthian stockholders will benefit since the WHISPER™ device will enter FDA Phase III trials in 9-12 months. (*Id*.)

VII.    Seventh Claim for Relief: Imposition of Constructive Trust, As to All Defendants

Plaintiff seeks a constructive trust over "any and all of the substantial monies obtained from Plaintiff by any and all Defendants by virtue of the fraud, breach of fiduciary duties, and/or negligence described herein, in connection with the Defendants' sale of Corinthian stock to Plaintiff, and the fraudulent transfer of the assets of Defendant Corinthian to Defendant Eyenovia, Inc." (Compl., Exh. 1 at ¶ 101; *see* ECF No. 86).

Generally, courts are authorized to impose a constructive trust "wherever specific restitution in equity is appropriate on the facts." *Flanigan v. Munson*, 175 N.J. 597, 608 (2003) (citation omitted)). A constructive trust is designed to "prevent unjust enrichment and force a restitution to the plaintiff of something that in equity and good conscience [does] not belong to the defendant." (*Id.*) (citation omitted). A constructive trust is warranted when the court finds: 1) a party has committed "a wrongful act," which can be "an innocent misstatement" or a "simple mistake," and 2) the wrongful act must "result in a transfer or diversion of property that unjustly enriches the recipient" (*Id.*) (citations omitted)).

The Plaintiff maintains that its funds are being kept beyond its reach because the Defendants have engaged in financial shenanigans with Corinthian and Eyenovia, such that Plaintiff will unlikely recover any of its investment. (Pl.'s Br. at 39; *see* ECF No. 91). The Defendants argue that the Plaintiff has not shown that any of the defendants 1) undertook wrongful or negligent conduct in connection with Plaintiff's purchase of Corinthian stock or the sale of Corinthian's assets to Eyenovia or 2) profited improperly or were unjustly enriched as a result of Plaintiff's purchase of Corinthian stock. (Def.'s Br. at 39; *see* ECF No. 86-35). Defendants supports its position by arguing that 1) Corinthian properly used Plaintiff's investment during the development of the WHISPER™ device, 2) the sale of Corinthian's assets to Eyenovia was fair

and benefited the Plaintiff, 3) Defendants Ianchulev and Packer received minimal compensation while employed at Corinthian, and 4) Defendant Ballou only received a salary as CEO of Corinthian. (*Id.*)

## **CONCLUSION**

There are genuine disputes of material fact as to whether the Defendants misrepresented or omitted facts regarding the WHISPER™ device's engineering capabilities, such that both motions to dismiss should are denied.

ORDER

This matter having come before the Court on Plaintiff's (Princeton Ophthalmic, LLC) motion for partial summary judgment (ECF No. 85) and Defendants, Skip Ballou, Corinthian Ophthalmic, Inc., Eyenovia, Inc., Sean Ianchulev, Dr. Mark Packer motion for summary judgment (ECF No. 86); and the Court having reviewed the submissions of the parties; and for the reasons set forth above;

IT IS on this 10th day of October, 2017;

ORDERED that Plaintiff's motion for partial summary judgment is denied (ECF No. 85); and it is further

ORDERED that Defendants,  Skip Ballou, Corinthian Ophthalmic, Inc., Eyenovia, Inc., Sean Ianchulev, Dr. Mark Packer motion for summary judgment (ECF No. 86) is denied.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.